**FMC CORPORATION, Plaintiff,**

v.

**Ivan F. BOESKY; Boesky & Kinder Partners, L.P.; Ivan F. Boesky & Company, L.P.; IFB Managing Partnership, L.P.; Cambrian & General Securities, p.l.c.; Beverly Hills Hotel Corporation; Farnsworth and Hastings Limited; Northview Corporation; Seemala Partners, L.P.; Seemala Corporation; Ivan F. Boesky Corporation; Goldman, Sachs & Co.; David S. Brown; Shearson Lehman Brothers, Inc.; Ira B. Sokolow; Drexel Burnham Lambert Inc., and Dennis B. Levine, Defendants.**

No. 86 C 9879.

United States District Court,
N.D. Illinois, E.D.

April 16, 1987.

Thomas P. Sullivan, Richard T. Franch, Barbara S. Steiner, Kaarina Salovaara, Jenner & Block, Chicago, Ill., for FMC Corp.

Howard D. Lieberman, H. Nicholas Berberian, Thomas M. Knepper, Peter B. Newton, Neal, Gerber & Eisenberg, Glen H. Kanwit, David B. Goroff, Hopkins & Sutter, R.L. Mitchell, P.V. Baugher, Adams, Fox, Adelstein & Rosen, Warren J. Marwedel, Tribler & Marwedel, P.C., Chicago, Ill., Eliot Lauer, Peter Fleming, Jr., Bernard V. Preziosik, Jr., Curtis, Mallett, Prevost, Colt & Mosle, New York City, Steven L. Bashwiner, Mary Ellen Hennessy, Katten, Muchini, Zavis, Pearl, Greenberg & Galler, Roger Pascal, Allan Horwich, Kevin D. Evans, Schiff, Hardin & Waite, James A. Klenk, Don H. Reuben, Margaret S. Determan, James K. Meguerian, Isham, Lincoln & Beale, Clarence J. Fleming, Thomas C. Elliott, Jr., McDougall, Hersh & Scott, Chicago, Ill., Mitchell H. Kaplan, Joshua T. Buchman, Choate, Hall & Stewart, Boston, Mass., Robert B. McCaw, Wilmer, Cutler & Pickering, Washington, D.C., Richard T. Sharp, Harry Frischer, Sidney H. Stein, Eric Schmidt, Stein, Zauderer, Ellenhorn, Frischer & Sharp, New York City, Derek W. Hunt, Troy, Casden & Gould, Los Angeles, Cal., Joel A. Haber, Floyd Babbitt, Fagel, Haber & Maragos, Jonathan G. Bunge, David E.

Schaper, Monica L. Thompson, Keck, Mahin & Cate, Chicago, Ill., William E. Willis, pro hac vice, Robert J. Katz, Robert J. Lack, Pressly M. Millen, Sullivan & Cromwell, New York City, for defendants.

Anthony F. Phillips, Jeanne M. Luboja, Jonathan P. Wolfert, Zipoah J. Szydlo, Willkie Farr & Gallagher, Jonathan D. Bassett, Terri Jeligman, New York City, for Shearson Lehman Bros., Inc.

## MEMORANDUM OPINION
## AND ORDER

ANN C. WILLIAMS, District Judge.

This case is one of the first private civil actions filed in the wake of the Securities and Exchange Commission's ("SEC") well-publicized charges that Ivan F. Boesky had been the recipient of wrongfully leaked insider information. The SEC charged that Boesky used the leaked corporate information to make millions of dollars in trading in the stock of at least seven corporations. One of these seven corporations, FMC Corporation ("FMC"), is the plaintiff in this action. FMC alleges that because of Boesky's illegal trading in its stock, the corporation has suffered damages of over $230 million in connection with its recent recapitalization. In sixteen counts, the complaint alleges that some or all of the defendants violated several federal securities laws, all four of the civil provisions of the Rackeeter Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(a), (b), (c) and (d), and various state common laws. All defendants contend that plaintiff lacks standing to sue them, and so they have filed motions to dismiss the complaint in its entirety. For the reasons that follow the court agrees and grants the motion.

### The Parties

FMC is a Delaware corporation with its principal place of business in Chicago. Its primary activities are manufacturing and mining. There are seventeen defendants named in the complaint, including Ivan F. Boesky ("Boesky"). Ten of the defendants are corporations and entities allegedly controlled by Boesky and are referred to in the complaint as the "Boesky Affiliated Entities." According to the allegations, Boesky made his purchases and sales of FMC stock through one or more of these Affiliated Entities. Defendant Goldman, Sachs & Co. ("Goldman") acted as FMC's financial advisor on the recapitalization. Defendants David S. Brown, Ira B. Sokolow, and Dennis B. Levine allegedly passed to Boesky confidential information about the recapitalization. Shearson Lehman Brothers, Inc. ("Lehman") and Drexel Burnham Lambert, Inc. ("Drexel") are named as defendants because Lehman employed Sokolow, and Drexel employed Levine.

### Facts

The well-pleaded facts of the complaint, taken as true as they must be for purposes of this motion to dismiss, tell the following story. In early 1985, FMC's management embarked on a plan to "restructure" the corporation. To this end, it hired Goldman as financial advisor. At first management considered a leveraged buy-out, but later rejected that course in favor of a plan of recapitalization. By this plan, FMC sought to decrease the proportionate equity interest of public shareholders and increase the equity held by management.[1] Between December 1985 and May 1986 FMC and Goldman worked out the terms of the deal. In doing so, Goldman analyzed FMC's corporate structure, its long-term prospects in light of anticipated general economic and business conditions, and the growth nature of FMC's principal businesses. Goldman also had to evaluate the recapitalization plan and offer an opinion about its fairness to public shareholders.

On February 21, 1986, in a letter to FMC's board, Goldman outlined the terms of the proposed recapitalization. The proposal called for an exchange of old FMC shares for newly issued stock ("New FMC

---

1. Recapitalization can be a powerful defensive tactic against hostile take-over attempts when used by corporations with large amounts of cash but inadequate opportunities to reinvest in the company. Loderman & Goroff, *Recapitali-* *zation Transactions,* 19 Rev. of Sec. & Commodities Reg., 241 (November 19, 1986). The recapitalization reduces the firm's attractiveness for would-be take-over bidders by a substantial substitution of debt for equity. *Id.* at 242.

stock"). The public shareholders would receive one share of New FMC stock plus $70 in cash in exchange for each share of old FMC stock. Management would receive 5.667 shares of New FMC stock in exchange for each share of old FMC stock.[2] At the time Goldman announced the plan, it also issued its fairness opinion, stating that the terms were fair to public shareholders.

In reaching its fairness opinion, Goldman estimated that each share of old FMC stock held by the public shareholders and management had a value of $85. This estimate was consistent with the price at which the stock was trading; on February 21, 1986, the day Goldman issued its fairness opinion, FMC stock closed at $85 per share on the New York Stock Exchange ("NYSE"). Goldman also expected that each share of New FMC stock would have a market value of $15 after the recapitalization.

In the meantime, unknown to FMC (or its board), confidential information relating to FMC's potential recapitalization was leaked to outsiders. Brown, a Goldman vice-president, disclosed the information to defendant Ira Sokolow, a Lehman vice-president. Sokolow then passed the information on to defendant Dennis Levine. Levine in turn disclosed the information to defendant Ivan Boesky. Armed with the inside tips about the recapitalization, Boesky purchased approximately 95,300 shares of FMC common stock. On the day Boesky began his trading, February 18, 1986, FMC stock opened on the NYSE at $71.25 per share. On February 20, 1986, the day before Boesky's purchases ceased, the stock closed at $80.25 per share. During these three days approximately 707,000 shares of FMC stock traded on the NYSE. Boesky's purchases accounted for about 13% of the total volume traded.

On the morning of February 21, 1986, the price of FMC's stock continued to rise.

By mid-morning the stock climbed to $83.00 per share. At this point, FMC requested that trading in its stock be temporarily suspended; it then made public the possibility that the corporation would be recapitalized. After this announcement, trading in the stock resumed. At the close of trading that day, the price of the stock stood at $85.625. The next day FMC's board approved the recapitalization plan and announced its terms to the public. By that time, Boesky had begun to sell the 95,300 shares he had purchased between February 18 and February 21.

After the February 22nd approval and announcement of the recapitalization, the price of FMC stock continued to rise. Therefore, Goldman urged FMC to review the cash portion of the deal. Because of the price rise, Goldman believed that a cash payment of $70 would no longer be fair to the public shareholders. Goldman therefore began to urge FMC's board to review the cash portion. Unbeknownst to FMC, Brown told Sokolow and Levine that the cash portion was under review. Levine then told Boesky. With this leaked information, Boesky and his Affiliated Entities bought about 1,922,000 shares of FMC stock between March 12, 1986 and April 4, 1986. These purchases accounted for more than 50% of the total volume of trading in FMC stock during this period. The complaint alleges that, because of Boesky's purchases, the price of FMC stock rose sharply to an artificial and distorted price level.

On April 7, 1986, Goldman informed FMC's board that because of the high market price of FMC stock, Goldman might withdraw its February 21, 1986 fairness opinion.[3] Subsequently the trading price of FMC stock continued to rise, reaching $97 per share on April 25. As a result, Goldman told FMC that it would withdraw the fairness opinion unless FMC either in-

---

2. The plan also called for an exchange of old FMC stock held by the employee Thrift Plan. The Plan would receive $25 in cash plus four shares of New FMC stock for each old share.

3. Also on April 7, 1986, Boesky and the Affiliated Entities filed a Schedule 13D with the SEC.

The Schedule 13D disclosed the dates and amounts of Boesky's FMC purchases made between March 12 and April 4. FMC claims the filing was false because it did not reveal Boesky's earlier trading which occurred between February 18 and February 21.

creased from $70 to $80 the cash payment to be made to public shareholders, or decreased the number of shares of New FMC stock to be given to management shareholders. FMC's board opted for the $10 cash increase to public shareholders.[4] Goldman also revised its estimate of the post-recapitalization market value of New FMC stock. The new estimate was $17.14 per share.

While the FMC board considered this new plan, the trading price of its stock continued to rise. Thus, on April 26, 1986, FMC's board agreed with Goldman and publicly announced that it would increase from $70 to $80 the cash portion to be paid to public shareholders. As a result of this cash increase, the revised recapitalization plan called for an additional $220 million to go to the public shareholders. Goldman also issued on April 26th, a fairness opinion stating that the new plan was fair to public shareholders. On May 2, 1986, FMC distributed a joint proxy statement/prospectus to the shareholders for the annual meeting to be held on May 22, 1986. At the meeting, the shareholders approved the plan and FMC executed it on May 28, 1986.

Meanwhile, on April 28, 1986, the first day of trading after the announcement of the increase in the cash to be paid to public shareholders, Boesky and the Affiliates began to sell their FMC stock. By May 1, 1986, they had sold enough of their shares to realize a profit in excess of $20 million. Eventually, all four of the individual defendants, Boesky, Levine, Brown, and Sokolow, were either sued by the SEC or indicted by the federal government on charges of violating various securities laws.

### FMC's Claims

FMC alleges that as a result of Boesky's illegal conduct it paid $220 million more for the publicly held shares of FMC stock than it would have paid absent that conduct. It also claims that Boesky's actions resulted in an increase in the debt, as well as other costs, FMC incurred to finance the recapitalization. Further, Goldman received

more than $17.5 million in fees and expenses for its role in the recapitalization; FMC contends these fees should be returned to it.

Counts I through V charge violations of federal securities laws; all of these Counts, except Count IV are brought against all defendants. Count I is brought under Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder. This Count alleges defendants either singly, by aiding and abetting, or by conspiring made untrue statements of material fact and omitted to state material facts in connection with the purchase and sale of FMC stock.

Count II alleges defendants' misconduct was in connection with a tender offer, and therefore violated Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e), and its attendant Rule 14e–3. Count III alleges market manipulation in violation of Section 9(a) of the Exchange Act, 15 U.S.C. § 78i(a). Count IV is brought under Section 18(a) of the Exchange Act, 15 U.S.C. § 78r(a), and charges that Boesky and the Affiliated Entities made false and misleading statements in the Schedule 13D. FMC claims it relied upon these statements when it purchased FMC's stock. Finally, in Count V, FMC contends that by the same conduct which violated Rule 10b–5, defendants violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

Counts VI through VIII are the RICO counts. Count VI is against defendants Boesky, Brown, Sokolow, Levine and the Affiliated Entities, and claims that those defendants violated Sections 1962(a) and (d) of RICO. Count VII alleges that all defendants violated Sections 1962(c) and (d); and Count VIII charges all defendants with offending Sections 1962(b), (c) and (d).

The remaining counts allege various common law violations, including fraud by all defendants and negligence by Goldman, Lehman and Drexel (because their employees leaked confidential information to Boesky). The claim for relief seeks $235 mil-

---

**4.** FMC chose this option because a decrease in the shares of New FMC stock going to manage-

ment would result in adverse tax consequences for FMC's public shareholders.

lion in actual and consequential damages and repayment of the additional expenses incurred in the recapitalization. Plaintiff also seeks to recover the profits defendants realized from their trading in FMC's stock, treble damages under RICO, and punitive damages under some of the common law counts. Defendants contend plaintiff sustained no legally cognizable injury and therefore lacks standing to seek any recovery.

### Discussion

Defendants maintain that there are a multitude of defects in the complaint which require its dismissal. However, the court has asked the parties to confine their initial round of briefing to the question of whether FMC has standing to sue. On this issue, defendants make a number of specific challenges to FMC's standing to assert claims under the federal securities laws and under RICO.[5] These arguments, however, are subsidiary to defendants' primary attack. In that attack defendants assert that plaintiff has suffered no legally cognizable injury, and therefore, cannot, consistent with Article III of the Constitution, seek relief under any of the legal theories set forth in the complaint.

The defendants' primary argument really distills to two. The first proceeds as follows. The assets of FMC are beneficially owned by FMC's shareholders. Therefore, any judgment in favor of FMC will inure to the benefit of those shareholders. Yet these same shareholders received the alleged $220 million "overpayment" which FMC now seeks to recover from defendants. The shareholders would thus receive the $220 million twice, once in the recapitalization, and again as beneficial owners of any judgment collected by FMC from defendants. Such a windfall is inequitable defendants argue, an inequity which requires the court to "pierce the corporate

veil" and deny standing to FMC. In support of this argument, defendants cite *Bangor Punta Operations, Inc. v. Bangor & Aroostook Co.*, 417 U.S. 703, 708–11, 94 S.Ct. 2578, 2581–83, 41 L.Ed.2d 418 (1974).

*Bangor Punta* was a derivative action brought on behalf of a Maine railroad corporation by a shareholder who owned nearly 99% of the corporation's stock. The complaint alleged that in 1964 the petitioner, Bangor Punta Corp. ("Bangor Punta"), through its wholly owned subsidiary, Bangor Punta Operations, Inc., acquired from its holding company, Bangor & Aroostook Corp. ("B & A") nearly 99% of the stock of respondent Bangor & Aroostook Railroad Co. ("BAR"). From 1964 to 1969 Bangor Punta controlled and directed BAR. In 1969 Bangor Punta, through its subsidiary, sold all of its BAR stock to Amoskeage Co. Two years later, BAR filed an action against its former owners, Bangor Punta and its subsidiary, alleging various acts of corporate mismanagement during the period 1960 through 1969 when B & A and Bangor Punta controlled the railroad. The complaint sought damages for violations of the federal antitrust and securities laws, as well as Maine statutory and common law.

In a 5–4 decision, the Supreme Court held that under principles of equity a stockholder who has purchased all or substantially all of the shares of a corporation at a fair price cannot seek to have the corporation recover against the seller for prior corporate mismanagement. *Id.* at 710, 94 S.Ct. at 2582–83. The alleged wrongs to the corporation occurred during the period Bangor Punta and its subsidiary owned and controlled the corporation. Yet Amoskeage sought to recover damages from these same prior owners. "In other words," the Court said, Amoskeage "seeks to recover for wrongs Bangor Punta did to *itself* as

---

**5.** Defendants' specific attacks on plaintiff's standing are (1) plaintiff was neither a purchaser nor seller of securities during the time period in which Boesky and Company traded (March 12 through April 4th), thus FMC has no standing to assert claims based on §§ 10(b) and 18(a) of the securities laws; (2) §§ 10(b) and 18(a) require that Boesky have had material information which he did not disclose to FMC and that

FMC was unaware of, yet FMC knew as much (and more) about its recapitalization plans as Boesky knew (thus FMC was not deceived); (3) FMC as the offeror of securities in a tender offer has no standing under the Williams Act; and (4) plaintiff has not and cannot allege that the price of FMC's stock declined after Boesky's trading and thus FMC has no standing udner § 9(a) for market manipulation.

owner of the railroad." *Id.* at 712, 94 S.Ct. at 2584 (emphasis in original). Any recovery would be a windfall to Amoskeage, and therefore it had no "standing in equity" to recover. Nor did it matter that the suit was brought on behalf of the corporation. "[W]here equity would preclude the shareholders from maintaining an action in their own right, the corporation would also be precluded." *Id.* at 713, 94 S.Ct. at 2584.

In reaching its conclusion that Amoskeage and BAR were precluded from maintaining the action, the Court relied on Dean Roscoe Pounds' decision in *Home Fire Insurance Co. v. Barber*, 67 Neb. 644, 93 N.W. 1024 (1903). That case held that where all the shareholders of a corporation had acquired their shares from a wrongdoer at a price that reflected the acts of mismanagement, the corporation had no standing to sue the former owner. As Dean Pound put it, "whatever will estop the shareholders will estop the corporation." 67 Neb. 644, 93 N.W. at 1033.

As one court has noted, the principles underlying the *Home Fire* decision overlap and are equitable in nature; those principles are: (1) the "tainted shares" doctrine, which prevents a shareholder from basing a cause of action on acts of corporate mismanagement if the seller of the shares participated or acquiesced in the wrongdoing; (2) the contemporaneous ownership rule, which requires that the plaintiff have owned his shares at the time of the alleged wrongdoing; and (3) the inequity of allowing shareholders who acquire a large part of their interest as a result of the very acts of mismanagement complained of, and who paid a fair market value, to recover their purchase price, i.e. "to prevent the new shareholders from reaping a windfall by in effect obtaining a corporation for nothing." *National Union Electric Corp. v. Matsushita Electric*, 498 F.Supp. 991, 996 (E.D. Pa.1980).

Defendants urge that the reasoning of *Bangor Punta* should be applied to this case. But, as the court sees it, the equitable principles underlying *Home Fire* and applied in *Bangor Punta* arose from factual circumstances very different from those which exist in this case. In *Home Fire* and *Bangor Punta* the shareholders sought to claim damages which had occurred to the corporation prior to the transfer of the shares, yet the shareholders did not claim that the price they paid for the shares was greater than the shares were worth. What the shareholders were asking for was "in effect to rescind contracts knowingly and voluntarily entered into while nevertheless retaining the benefits of their bargains." 498 F.Supp. at 997. Thus, the "windfall" which the Supreme Court found repugnant in *Bangor Punta*, arose where Amoskeage sought to enhance the value of its bargain, i.e., when it tried to recover back from the defendants the consideration that Amoskeage paid even though that consideration fairly reflected the value of the shares. *Id.* at 1002.

■ In contrast, we are not dealing here with a purchaser who seeks to recover the consideration it paid to its vendor; rather FMC seeks to recover from a third party for wrongdoing done to it. Thus, none of the equitable principles which informed the *Bangor Punta* decision have any relevance here, and that case is of little aid in deciding whether FMC's corporate entity ought to be disregarded.[6]

The second variant of defendants' primary standing argument is premised upon the notion that the assets of a corporation are owned by its shareholders, and the shareholders may vote to distribute these assets to themselves. By doing so, the shareholders simply take direct ownership of that which they already own directly. To allow a corporation to sue for recovery of assets it has distributed to its own shareholders would thus allow those share-

---

6. Ordinarily the corporate form is respected unless it has been used "to perpetrate a fraud" or unless the corporate owners "have so dominated or disregarded [the corporation's] corporate form that the owners primarily transacted [the owners'] business rather than the corporation's business." *See, Minpeco S.A. v. Conti–Commodity Services, Inc.*, 549 F.Supp. 857, 859 (S.D.N.Y. 1982) (declining to apply *Bangor Punta* to pierce corporate form). Defendants do not contend that the corporate form has been abused by plaintiff.

holders a double recovery—once by way of a direct distribution, and a second time by replenishing the corporate assets properly diminished by such a distribution. Or to use the metaphor of one defendant, FMC here asks that it be allowed to shift corporate assets from the left pocket to the right pocket, and then to refill the left pocket by a recovery from the defendants. (Reply brief of Drexel Burnham at 2). To support this argument defendants cite several cases for the proposition that where a pro rata distribution of corporate assets to the shareholders occurs, the corporation does not have standing to complain of the distribution. *See, Spiegel v. Beacon Participations, Inc.*, 297 Mass. 398, 8 N.E.2d 895, 912 (1937), *overruled in part on other grounds, Donahue v. Rodd Electrotype Co.*, 367 Mass. 578, 328 N.E.2d 505, 519 (1975); *Henry v. Wellington Telephone Co.*, 76 Ohio App. 77, 63 N.E.2d 233 (1945); *DeRaismes v. United States Lithograph Co.*, 161 A.D. 781, 146 N.Y.S. 813 (1st Dep't. 1914); *Hutchinson v. Stadler*, 85 A.D. 424, 83 N.Y.S. 509 (1st Dep't. 1903); *see also*, 12 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 431, at 117 (rev.perm.ed. 1985) ("a mere distribution of a portion of the capital of the corporation to the stockholders in proportion to their respective interests, and which does not impair the power of the corporation to discharge its indebtedness, is not such a waste or misappropriation of its fund as will give the corporation a cause of action for the amount so distributed.")

Plaintiff puts forth four responses in an attempt to refute defendants' argument. First, plaintiff contends that, even if the shareholders have no standing, FMC asserts its own injury, and therefore has standing to sue for the harm done to it. To support this view, plaintiff cites two cases. The first is *International Controls Corp. v. Vesco*, 490 F.2d 1334, 1345–46 (2d Cir.), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974). That case arose out of the alleged manipulations of the assets and securities of a number of corporations, in-

cluding the plaintiff International Controls Corp. ("ICC"), controlled by Robert Vesco.[7] The complaint alleged that two stock transfers were made in violation of § 10(b). In the first transaction, ICC incorporated Federal General ("FG") as a wholly owned subsidiary. The stock of FG was then transferred to Federal Aviation ("FA"), another ICC wholly owned subsidiary. In the second transaction, ICC transferred to its shareholders the stock of FA as a dividend in kind. The defendants moved to dismiss the complaint on the ground that, while ICC may have stated a claim for corporate mismanagement, it had not stated a claim under § 10(b) of the securities laws.

The Second Circuit held that ICC's transfer of its FG stock to its wholly owned subsidiary FA was not a sale within the meaning of § 10(b). Since ICC retained control over FA it relinquished nothing by transferring ownership of FG to FA. *Id.* at 1343. However, the dividend of FG stock to the shareholders of ICC was a "disposition of securities" entitled to protection under § 10(b). ICC had been defrauded by giving up a valuable asset and getting nothing for it. *Id.* at 1345. To the dissent's argument that the shareholders of ICC had suffered no harm and therefore neither had the corporation, the majority argued that § 10(b) was intended to protect not only the shareholders of a defrauded corporation, but its creditors as well. *Id.* at 1346.

The *Vesco* case does not specifically focus on the question of whether a corporation has standing to sue where the corporation's only basis for its alleged injury was a distribution of corporate assets to its shareholders. The case was about whether or not either of the transactions at issue constituted a "sale" under § 10(b). The Second Circuit was not troubled by the issue of how a corporation can be injured in a transaction which benefits its shareholders, for in the court's view the possible injury to the corporation's creditors was enough to bring the transaction under the umbrella

---

7. This action was filed on behalf of the corporation by the Special Counsel appointed by a federal court pursuant to a consent judgment entered in litigation brought by the SEC against ICC.

of § 10(b). Because *Vesco* did not address the question presented in our case, this court does not think that the rule which emerges from *Vesco* is either responsive to the cases cited by defendants or is applicable to the factual situation here.

Nor does the second case cited by plaintiff provide any guidance. In that case, *Rathborne v. Rathborne*, 683 F.2d 914 (5th Cir.1982), the plaintiff, a minority shareholder, brought a federal securities fraud action to challenge the majority's approval of the reorganization of a family owned business. The Fifth Circuit affirmed the dismissal of the complaint. The court held that the shareholder had no standing to sue since he was neither a "purchaser" nor "seller" of securities. In fact, the court said, there had been no change in the shareholder's interest in the corporation, as after the reorganization, he continued to hold the same one-eighth interest in stock representing the same assets he held before the reorganization. How this case aids FMC's position remains a mystery.

Next plaintiff seems to argue that the excessive dividend cases cited by defendants do not apply here because, unlike FMC, the plaintiffs in those cases did not allege that the defendants breached any duty to the corporations, or that anyone but blameless shareholders had received a portion of the dividends. Here FMC seems to suggest that, because defendants' acts were unlawful, and because some of the defendants breached a fiduciary duty to plaintiff, then plaintiff is entitled to recover from defendants the $220 million received by the FMC shareholders. But FMC's attempt to distinguish the cases is unpersuasive. In each of the cases cited by defendants, the plaintiffs did allege that the corporate directors had breached their fiduciary duties by distributing illegal dividends. *See, e.g., Henry v. Wellington Telephone Co.*, 76 Ohio App. 77, 63 N.E.2d 233, 234 (1945) (plaintiffs contended that "the defendant directors, in disregard of their duties ... distributed an [illegal dividend] to the shareholders"). In addition, FMC's "blameless shareholder" argument is unclear. Nowhere does FMC identify the "blameless shareholders" who were injured

by the conduct of Boesky and Affiliates. Moreover, FMC says it seeks recovery for injury done to it, not to its shareholders. Therefore, the court does not see how the "blameless shareholder" argument advances the resolution of the problem.

As its third argument, FMC merely recites what it sees as its out-of-pocket damages. It identifies these damages as the extra $10 paid for each publicly held share of FMC stock, the additional debt incurred to finance the $10 per share payment, and the $17.5 million in fees it paid to Goldman. (FMC's Brief at 23). But merely to state that the extra $10 is an out-of-pocket loss is not responsive to the assertion that the $10 was merely a distribution of assets to the owners of those assets. Nor can the additional debt expense confer standing on FMC. If the distribution of the $220 million did not injure FMC, the court does not see how FMC can claim injury for choosing to fund the distribution by borrowings, rather than by selling off assets to fund the distribution. Perhaps, the $17 million which FMC says it is entitled to recover from Goldman gives FMC standing to seek recovery of that amount from that defendant on a theory of breach of contract or breach of fiduciary duty. But these damages cannot support standing to sue all of these defendants on the various federal claims asserted in the complaint. FMC does not seem to suggest that either the additional debt or the payment to Goldman can support its right to sue without its claim that it was injured by the $220 million distribution.

Finally, FMC is forced to assert that its standing does not depend upon whether it sustained out-of-pocket losses. Even if it suffered no out-of-pocket loss, FMC says, it may recover defendants' illegally-obtained profits. Support for this proposition, FMC contends is found in the Supreme Court's recent opinion in *Randall v. Loftsgaarden*, —— U.S. ——, 106 S.Ct. 3143, 3153, 92 L.Ed.2d 525 (1986). But again FMC has cited a case which is of no aid in resolving the standing issue in this case. *Randall* held only that in a securities fraud case a plaintiff need not subtract the tax benefits

he received from a tax shelter in calculating his damages. *Randall* is about the proper measure of damages, and nowhere suggests that a plaintiff who has suffered no harm may recover from a defendant who has profited by trading on inside information. Nor do the other cases cited by FMC require Boesky to disgorge his profits to FMC, in the absence of harm to FMC, merely because Boesky profited from his use of inside information. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972) and *Janigan v. Taylor*, 344 F.2d 781, 786 (1st Cir.), *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965) (both discussing only the proper measure of damages).

After review of the parties' contentions it appears that what they are really arguing about is how the transaction ought to be characterized. In its brief FMC has sought to establish its right to sue by characterizing the transaction as a purchase and sale of securities. At some points FMC argues that it was the seller in the transaction, while at other times it contends that it was the purchaser. On the other hand, defendants contend the recapitalization is nothing more than pro rata distribution of corporate assets to the corporation's shareholders. So characterized, the transaction is like a dividend.

In the court's view, the recapitalization was neither simply a purchase and sale nor a mere pro rata distribution of corporate assets. After the recapitalization, the shareholders of FMC, while remaining the same, held different equity interests than before. Thus, the transaction effected a shift of part of the equity from public shareholders to management shareholders. The transaction, therefore, is unlike the transactions at issue in cases such as *Rathborne v. Rathborne*, 683 F.2d 914 (5th Cir. 1982), where the shareholders retained the same equity interest after the transaction as they held before it. Nor is FMC's recapitalization on all fours with the typical distribution of small amounts of cash to shareholders as a dividend. The economic consequences of a cash (or property dividend) differ from the economic conse-quences of FMC's recapitalization. The dividend leaves the shareholders holding the same assets as they held before. See Jacobs, *Litigation and Practice Under Rule 10b–5*, § 38.02[b] (2d ed. 1985 rev.). Therefore, the transaction, while similar to a dividend (or other pro rata distribution of assets), economically is not the same as one.

Nor can FMC properly be characterized as either a defrauded purchaser or defrauded seller. While at times FMC attempts to characterize itself as a seller of securities, it is clear that in seeking recovery of the $220 million it distributed to the public shareholders, it does not claim injury as a result of the transfer of New FMC stock to the shareholders. The claim for recoupment of the $220 million can only relate to FMC's role as a "purchaser" of old FMC stock. In this regard, there is some logic to viewing the transaction between FMC and its public shareholders as a purchase of old FMC stock. After all, FMC acquired the old shares in exchange for New FMC shares plus $80, thus giving value in the exchange. But the transaction between the public shareholders and FMC was more than this, for the shareholders who received the cash remained shareholders after the transaction by virtue of their receipt of the New FMC shares. Therefore, any "overpayment" which FMC made, it made to its own shareholders, the same shareholders who approved the recapitalization.

█ The economic effect of the transaction can therefore properly be viewed as a distribution of part of FMC's assets to the owners of those assets in exchange for their giving up a part of their equity interest to management. So viewed, the transaction essentially is an instance of self-dealing, the movement of assets between the owners of those assets. Thus, while the corporate mismanagement cases defendants cite do not lend direct support for their argument, the court thinks that the cases do articulate a principle which intuitively applies to the facts here—that principle is that where the shareholders decide to distribute to themselves the assets of the

corporation on a pro rata basis, absent an erosion of the asset base in such a manner as to impinge upon the rights of creditors, no one has been harmed, so the corporation has suffered no injury.

■ Having said all this, the court realizes that how the transaction is characterized does not completely solve the problem of deciding whether FMC was injured by Boesky's illegal trading. But the court thinks the rest of the answer is to be found in the principles which underlie the prohibitions on insider trading. It is clear that not every economic harm that can be related to insider trading (or any other securities law violation) is compensable. *Piper v. Chris-Craft Industries*, 430 U.S. 1, 45–46, 97 S.Ct. 926, 951–52, 51 L.Ed.2d 124 (1977); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 738, 95 S.Ct. 1917, 1926–27, 44 L.Ed.2d 539 (1975) (plaintiff not entitled to relief merely by claiming it suffered loss "... due to corporate or insider activities in connection with the purchase or sale of securities"). The securities laws prohibit insider trading "because it is unfair to other investors who do not enjoy the benefits of access to inside information." *Freeman v. Decio*, 584 F.2d 186, 189 (7th Cir.1978). This is why standing to sue for injury arising from insider trading has been until now confined to those who traded with the defendant insider or his tippee. *See, e.g., Wilson v. Comtech*, 648 F.2d 88, 94–95 (2d Cir.1981) (and cases discussed therein).

■ Application of these principles reveals that FMC was not injured by Boesky's actions in a way covered by the insider trading rules. FMC's supposed injury did not stem from any trading Boesky did while he was in possession of confidential information superior to that possessed by FMC, for FMC knew as much about its recapitalization plan as Boesky knew. FMC contends that it did not know that Boesky possessed inside information and thus it was deceived. But no facts in the complaint links Boesky's mere possession of this information to management's decision to increase the cash portion of the deal. There are perhaps investors who were injured by Boesky in the manner encompassed by the insider trading prohibition. Thus, those who sold their shares to Boesky may have a cause of action against him. *See, e.g., Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 94–95 (2d Cir.1981). However, FMC was not such an investor.

Moreover, it is difficult to articulate FMC's injury when all of the shareholders benefited from the transaction, and there are no allegations of harm to creditors of FMC. The management shareholders obtained an increased equity interest, and the public shareholders received a cash distribution (perhaps made greater by Boesky's conduct) while retaining a significant equity interest in the corporation. The management shareholders can perhaps complain because their "purchase" of some of the equity held by public shareholders costs the corporation $220 million more than it would have absent the conduct of Boesky. But FMC makes no claim that management suffered an injury.

Therefore, while the court recognizes that the recapitalization was more than a distribution of FMC's assets to its shareholders, the court believes that such a characterization more appropriately describes the effects of the transaction. Viewed in this way, FMC suffered no injury and therefore has no standing to sue for return of the $220 million or the $20 million Boesky received in profits. FMC's federal claims must therefore be dismissed.[8] If corporations undergoing recapitalization are to be reimbursed for the costs they incur because of conduct such as Boeksy's, the court believes that the remedy awaits fashioning by Congress; there is no precedent in the case law for this relief.

One of the parties has asserted that FMC's lack of injury means that it lacks standing under all sixteen counts of the complaint. However, because the court rests its dismissal on the lack of Article III

---

**8.** The court agrees with defendant Northview that since § 1964(c) of RICO requires that to have standing a plaintiff must have been injured in its business or property, the RICO claims cannot survive if plaintiff received no economic injury.

standing, the state law claims may still be viable. As to these claims the court declines to exercise its pendent jurisdiction. Therefore, those claims are dismissed without prejudice.

### Conclusion

Plaintiff's complaint is dismissed in its entirety. The federal claims are dismissed pursuant to Rule 12(b)(6) Fed.R.Civ.P.; the court declines to exercise jurisdiction over the pendent state law claims and so those claims are dismissed without prejudice.