FMC CORPORATION, Plaintiff,

v.

Ivan F. BOESKY, Boesky & Kinder Partners, L.P.; Ivan F. Boesky & Company, L.P.; IFB Managing Partnership, L.P.; Cambrian & General Securities, P.L.C.; Beverly Hills Hotel Corporation; Farnsworth and Hastings Limited; Northview Corporation; Seemala Partners, L.P.; Seemala Corporation; Ivan F. Boesky Corporation; Goldman, Sachs & Co.; David S. Brown; Shearson Lehman Brothers Inc.; Ira B. Sokolow; Drexel Lambert Inc.; and Dennis B. Levine, Defendants.

No. 86 C 9879.

United States District Court, N.D. Illinois, E.D.

Nov. 7, 1989.

Thomas P. Sullivan, Richard T. Franch, Barbara S. Steiner and Kaarina Salovaara, Jenner & Block, Chicago, Ill., for plaintiff.

Anthony F. Phillips, Jeanne M. Luboja, Jonathan P. Wolfert, Ziporah J. Szydlo, Jonathan D. Bassett and Terri Jeligman, Willkie Farr & Gallagher, New York City, for Shearson Lehman Bros. Inc.

Howard D. Lieberman, H. Nicholas Berberian, Thomas M. Knepper, Peter B. Newton, Neal, Gerber & Eisenberg, Glen H. Kanwit, David B. Goroff, Hopkins & Sutter, R.L. Mitchell, P.V. Baugher, Adams, Fox, Adelstein & Rosen, Warren J. Marwedel, Keck, Mahin & Cate, Chicago, Ill., Eliot Lauer, Peter Fleming, Jr., Bernard V. Preziosik, Jr., Curtis, Mallett, Prevost, Colt & Mosle, New York City, Mitchell H. Kaplan, Joshua T. Buchman, Choate, Hall & Stewart, Boston, Mass., Steven L. Bashwiner, Mary Ellen Hennessy, Katten, Muchin, Zavis, Peal, Greenberger & Galler, Roger Pascal, Allan Horwich, Kevin D. Evans, Schiff, Hardin & Waite, James A. Klenk, Don H. Reuben, Margaret S. Determan, James K. Meguerian, Isham, Lincoln & Beale, Clarence J. Fleming, Thomas C.

Elliott, Jr., McDougall, Hersh & Scott, Chicago, Ill., Robert B. McCaw, Wilmer, Cutler & Pickering, Washington, D.C., Richard T. Sharp, Harry Frischer, Sidney H. Stein, Eric Schmidt, Stein, Zauderer, Ellenhorn, Frischer & Sharp, New York City, Derek W. Hunt, Troy, Casden & Gould, Los Angeles, Cal., Joel A. Haber, Floyd Babbitt, Fagel, Haber & Maragos, Jonathan G. Bunge, David E. Schaper, Monica L. Thompson, Keck, Mahin & Cate, Scott R. Lassar, Chicago, Ill., William E. Willis, Robert J. Katz, Robert J. Lack, Pressly M. Millen, Sullivan & Cromwell, New York City, pro hac vice, and Robert A. Langendorf, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ANN C. WILLIAMS, District Judge.

This case is once more before the court for a ruling on the defendants' motion to dismiss the plaintiff FMC Corporation's first amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). In its sixteen count complaint, FMC alleges that some or all of the defendants violated various provisions of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78kk, one provision of the Securities Act of 1933, 15 U.S.C. §§ 77a–77bbbb, all four provisions of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(a)–1962(d), and various provisions of state common law. The parties' struggle in this case has many of the attributes of a title fight between heavyweight boxers. The marquee lists several well-known participants including the plaintiff FMC, a large corporation whose total revenues exceeded $3.16 billion in 1987, as well as the infamous Ivan F. Boesky, and co-defendant investment banking firms Goldman, Sachs & Co., Shearson Lehman Brothers, Inc., and Drexel Burnham Lambert, Inc., among others. Moreover, the stakes are high as FMC claims in excess of $235 million in damages.

In the first round, this court granted the defendants' motion to dismiss FMC's Complaint. *See FMC Corp. v. Boesky,* 673 F.Supp. 242 (N.D.Ill.1987) (Wiliams, J.) ("FMC I"). The court reviewed the allegations of FMC's complaint and concluded that FMC lacked standing to pursue its claims because it did not suffer an injury. *Id.* at 251. In round two, a Seventh Circuit panel reversed this court's judgment by a two to one vote. *See FMC Corp. v. Boesky,* 852 F.2d 981 (7th Cir.1988) ("FMC II"). In this third round, the defendants attack FMC's amended complaint with a flurry of contentions. Some of these arguments are Tyson-like blows which purportedly "knock out" all or at least large segments of FMC's federal claims. Other arguments are directed towards eliminating individual counts. Finally, the defendants "jab" at some counts by attacking the specificity of FMC's pleadings. Interestingly, the defendants direct most of their efforts toward obtaining the dismissal of FMC's securities law claims. They make some attempts to undermine the RICO claims and allow the common law claims to stand virtually unchallenged. After a review of the parties' arguments and the pertinent authority, the court concludes that this third round will end in a split decision: FMC's securities law claims have been "knocked out" but its RICO and common law claims remain largely intact.

## I

### *Factual Background*

As the court has previously noted, this case was one of the first private civil actions filed in the wake of the Securities and Exchange Commission's well-publicized charges that Boesky had been the recipient of wrongfully leaked insider information. The SEC charged that Boesky used the leaked corporate information to make millions of dollars while trading in the stock of at least seven corporations. FMC is one of these seven corporations. FMC alleges that Boesky's illegal trading in its stock caused it to suffer in excess of $235 million dollars of damages in connection with its May, 1986 recapitalization. The pertinent factual allegations of the amended com-

plaint are as follows.[1]

FMC is a Delaware corporation with its principal place of business in Chicago. It produces machinery and chemicals for industry, government, and agriculture. Prior to its May, 1986 recapitalization 80 percent of FMC's twenty-two million common shares were publicly owned. FMC's common stock is traded on the New York Stock Exchange. In addition to Boesky, Goldman, Shearson, and Drexel, the rest of the defendants are as follows: David Brown, an officer of the defendant investment banking firm Goldman, Ira Sokolow, an officer of Shearson, Dennis Levine, an officer of Drexel, and the Boesky affiliated entities,[2] the various entities through which Boesky conducted his activities.

Sometime before early 1985, Boesky, Levine, Sokolow, and Brown agreed to share confidential business information about impending corporate transactions for their individual and collective financial benefit. As high-ranking officers of influential Wall Street investment banking firms, each had access to such confidential business information. As a securities arbitrager, Boesky had the ability to turn that information into profits.

In early 1985, after Boesky and his associates had made their arrangement, FMC's management embarked on a plan to "restructure" the corporation. To this end, it hired Goldman as financial advisor. At first management considered a leveraged buy-out, but later rejected that course in favor of a plan of recapitalization. By this plan, FMC sought to decrease the proportionate equity interest of public shareholders and increase the equity held by management.[3] Between December 1985 and May 1986 FMC and Goldman worked out the terms of the deal. In doing so, Goldman analyzed FMC's corporate structure, its long-term prospects in light of anticipated general economic and business conditions, and the growth nature of FMC's principal businesses. Goldman also had to evaluate the recapitalization plan and offer an opinion about its fairness to public shareholders.

On February 21, 1986, in a letter to FMC's board, Goldman outlined the terms of the proposed recapitalization. The proposal called for an exchange of old FMC shares for newly issued stock ("new FMC stock"). The public shareholders would receive one share of new FMC stock plus $70 in cash in exchange for each share of old FMC stock. Management would receive 5.667 shares of new FMC stock in exchange for each share of old FMC stock. FMC's Thrift Plan, a type of employee profit sharing plan, would receive $25 in cash plus four shares of new FMC stock for each share of old FMC stock. At the time Goldman announced the plan, it also issued its fairness opinion, stating that the terms were fair to public shareholders.

In reaching its fairness opinion, Goldman estimated that each share of old FMC stock held by the public shareholders and management had a value of $85. This estimate was consistent with the price at which the stock was trading. On February 21, 1986, the day Goldman issued its fairness opinion, FMC stock closed at $85 per share on the New York Stock Exchange ("NYSE"). Goldman also expected that each share of new FMC stock would have a market value of $15 after the recapitalization.

---

1. This court will draw its statement of facts largely from the Seventh Circuit and this court's earlier opinions. *See FMC II*, 852 F.2d at 982–85; *FMC I*, 673 F.Supp. at 243–45.

2. The Boesky affiliated entities are: Boesky & Kinder Partners, L.P.; Ivan F. Boesky & Company, L.P.; IFB Managing Partnership, L.P.; Cambrian & General Securities, p.l.c.; Beverly Hills Hotel Corporation; Farnsworth and Hastings Limited; Northview Corporation; Seemala Partners, L.P.; Seemala Corporation; and Ivan F. Boesky Corporation.

3. Recapitalization can be a powerful defensive tactic against hostile take-over attempts when used by corporations with large amounts of cash but inadequate opportunities to reinvest in the company. Loderman & Goroff, *Recapitalization Transactions*, 19 Rev. of Sec. & Commodities Reg. 241 (November 19, 1986). The recapitalization reduces the firm's attractiveness for would-be take-over bidders by a substantial substitution of debt for equity. *Id.* at 242.

In the meantime, unknown to FMC (or its board), confidential information relating to FMC's potential recapitalization was leaked to outsiders. Brown, a Goldman vice-president, disclosed the information to defendant Ira Sokolow, a Lehman vice-president. Sokolow then passed the information on to defendant Dennis Levine. Levine in turn disclosed the information to defendant Ivan Boesky. Armed with the inside tips about the recapitalization, Boesky purchased approximately 95,300 shares of FMC common stock. On the day Boesky began his trading, February 18, 1986, FMC stock opened on the NYSE at $71.25 per share. On February 20, 1986, the day before Boesky's purchases ceased, the stock closed at $80.25 per share. During these three days, approximately 707,000 shares of FMC stock traded on the NYSE. Boesky's purchases accounted for about 13% of the total volume traded.

On the morning of February 21, 1986, the price of FMC's stock continued to rise. By mid-morning the stock climbed to $83.00 per share. At this point, FMC requested that trading in its stock be temporarily suspended; it then made public the possibility that the corporation would be recapitalized. After this announcement, trading in the stock resumed. At the close of trading that day, the price of the stock stood at $85.625. The next day FMC's board approved the recapitalization plan and announced its terms to the public. By that time, Boesky had begun to sell the 95,300 shares he had purchased between February 18 and February 21.

After the February 22nd approval and announcement of the recapitalization, the price of FMC stock continued to rise. Therefore, Goldman urged FMC to review the cash portion of the deal. Because of the price rise, Goldman believed that a cash payment of $70 would no longer be fair to the public shareholders. As a result, Gold-man began to urge FMC's board to review the cash portion. Unbeknownst to FMC, Brown told Sokolow and Levine that the cash portion was under review. Levine then told Boesky. With this leaked information, Boesky and his Affiliated Entities bought about 1,922,000 shares of FMC stock between March 12, 1986 and April 4, 1986. These purchases accounted for more than 50% of the total volume of trading in FMC stock during this period. The amended complaint alleges that, because of Boesky's purchases, the price of FMC stock rose sharply to an artificial and distorted price level.

On April 7, 1986, Goldman informed FMC's board that because of the high market price of FMC stock, Goldman might withdraw its February 21, 1986 fairness opinion.[4] Subsequently the trading price of FMC stock continued to rise, reaching $97 per share on April 25. As a result, Goldman told FMC that it would withdraw the fairness opinion unless FMC either increased from $70 to $80 the cash payment to be made to public shareholders, or decreased the number of shares of new FMC stock to be given to management shareholders. FMC's board opted for the $10 cash increase to public shareholders.[5] Goldman also revised its estimate of the post-recapitalization market value of new FMC stock. The new estimate was $17.14 per share.

While the FMC board considered this new plan, the trading price of its stock continued to rise. Thus, on April 26, 1986, FMC's board agreed with Goldman and publicly announced that it would increase from $70 to $80 the cash portion to be paid to public shareholders. The Thrift Plan was also to receive 4.209 shares of new FMC stock for each share of its old FMC stock. As a result of this cash increase, the revised recapitalization plan called for an additional $220 million to go to the pub-

4. Also on April 7, 1986, Boesky and the Affiliated Entities filed a Schedule 13D with the SEC. The Schedule 13D disclosed the dates and amounts of Boesky's FMC purchases made between March 12 and April 4. FMC claims the filing was false because it did not reveal Boe-sky's earlier trading which occurred between February 18 and February 21.

5. FMC chose this option because a decrease in the shares of new FMC stock going to management would result in adverse tax consequences for FMC's public shareholders.

lic shareholders. On this date, Goldman issued a fairness opinion stating that the new plan was fair to public shareholders. On May 2, 1986, FMC distributed a joint proxy statement/prospectus to the shareholders for the annual meeting to be held on May 22, 1986. The shareholders also approved an amendment to FMC's charter requiring a supermajority to authorize certain business combinations. At the meeting, the shareholders approved the plan. On May 28, 1986, FMC executed the plan.

Meanwhile, on April 28, 1986, the first day of trading after the announcement of the increase in the cash to be paid to public shareholders, Boesky and the Affiliates began to sell their FMC stock. By May 1, 1986, they had sold enough of their shares to realize a profit in excess of $20 million. Eventually, all four of the individual defendants, Boesky, Levine, Brown, and Sokolow, were either sued by the SEC or indicted by the federal government on charges of violating various securities laws. These four individual defendants have all pled guilty to various criminal charges relating to the SEC's investigation. Boesky, as FMC dryly notes, currently resides at the Federal Correctional Institution in Lompoc, California.

When ruling on this Rule 12(b)(6) motion, the court will accept FMC's allegations as true and will dismiss the complaint "for failure to state a claim only if [FMC] can prove no set of facts upon which relief will be granted." *First Interstate Bank, N.A. v. Chapman & Cutler*, 837 F.2d 775, 776 (7th Cir.1988); *Rutan v. Republican Party of Illinois*, 868 F.2d 943, 944 (7th Cir.1989). Nevertheless, the court notes that it is "not obligated ... to ignore any facts set forth in the complaint that undermine the plaintiff's claim or to assign any weight to unsupported conclusions of law." *Gray v. Dane County*, 854 F.2d 179, 182 (7th Cir. 1988). The court will treat the voluminous exhibits that were appended to the complaint as part of the pleadings for the purposes of this motion. *See Beam v. IPCO Corp.*, 838 F.2d 242, 244 (7th Cir.1988).

## II

### *All Federal Claims: FMC Suffered No Actual Damages*

The defendants' first and most powerful argument supporting the dismissal of the complaint is that FMC suffered no actual economic damages as a consequence of their allegedly fraudulent activities. In its initial opinion, this court predicated its holding that FMC lacked standing on a finding that FMC suffered no damage from the recapitalization and its attendant costs. *See FMC I*, 673 F.Supp. at 250, 251 & n. 8. In its opinion, the Seventh Circuit held that the question of whether FMC suffered any specific amount of damages was irrelevant to the determination of "whether FMC was injured for the purpose of Article III's case or controversy requirement." *FMC II*, 852 F.2d at 992 n. 21. The Seventh Circuit found that this court erred by concentrating on the prudential or statutory dimension of the standing inquiry without first completing its analysis of whether FMC had satisfied the Article III constitutional requirements of the standing doctrine. *Id.* at 988–89. The Seventh Circuit proceeded to find that FMC had indeed made sufficient allegations to satisfy Article III's injury requirement. *Id.* at 994.

However, the court did *"not* hold that FMC has satisfied any of the [applicable] nonconstitutional or prudential standing limitations" as it is possible to allege an injury that satisfies Article III's case or controversy requirement "yet fails to fall within the zone of interests protected by a specific federal statute." *Id.* at 994, 989 (emphasis in original). As a result of the majority's more narrowly focused inquiry, it did not evaluate this court's determination that FMC suffered no damages on account of the recapitalization.[6]

This court's task on remand is "to determine whether FMC's federal claims fall within the zones of interests protected by the federal statutes under which FMC

---

**6.** In his dissent, Judge Manion explicitly adopted this court's determination that FMC was not damaged. *Id.* at 997–998 (Manion, J., dissenting).

seeks relief." *Id.* at 994.[7] The question of whether FMC suffered any actual economic damage as a consequence of the defendants' actions is a pertinent one. To be able to recover under its securities claims, FMC must establish that it suffered actual damages. *See* 15 U.S.C. § 78bb; *Pelletier v. Stuart–James Co., Inc.*, 863 F.2d 1550, 1557 (11th Cir.1989); *Sound Video Unlimited, Inc. v. Video Shack, Inc.*, 700 F.Supp. 127, 142 (S.D.N.Y.1988); *The Limited, Inc. v. McCrory Corp.*, 683 F.Supp. 387, 392 (S.D.N.Y.1988) (listing cases). " 'Actual damages' has been interpreted to mean some form of economic loss and does not include punitive damages." *Pelletier*, 863 F.2d at 1557, 1558.

Under the RICO statute, persons may recover treble damages if they have been injured in their business or property. 18 U.S.C. § 1964(c). A plaintiff must show that his or her injury resulted in economic loss to recover under RICO. *See Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 151, 107 S.Ct. 2759, 2764, 97 L.Ed.2d 121 (1987) ("RICO ... [is] designed to remedy economic injury"); *Religious Technology Center v. Wollersheim*, 796 F.2d 1076, 1089 (9th Cir.1986), *cert. denied*, 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987) ("the treble damages remedy is a potent weapon, [which] necessarily assumes that economic injury has occurred"); *Flaherty v. Torquato*, 623 F.Supp. 55, 58 (W.D.Pa.1985), *aff'd without opinion*, 800 F.2d 1133 (3d Cir.1986).

The failure to allege an injury that results in the appropriate type of damages is a fatal defect in a plaintiff's complaint. As the Seventh Circuit recently noted, investors bringing a "securities fraud claim cannot complain about a fraud that did not cause them any harm." *Latigo Ventures v. Laventhol & Horwath*, 876 F.2d 1322, 1325 (7th Cir.1989) (citing to *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 154, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972)). Causes of action brought under the securities fraud statutes share "the requirement common to all tort cases of proving that the alleged tort actually harmed the plaintiff." *Id.* at 1326; *see also Harris Trust and Savings Bank v. Ellis*, 810 F.2d 700, 706 (7th Cir.1987) (when discussing an action under § 10(b) the court states that "the supposition that there has been a violation ... does not matter if the violation did not cause any injury.... The plaintiff must prove damages"); *Pelletier*, 863 F.2d at 1558 ("A plaintiff has the burden of proving every element of his Rule 10b–5 anti-fraud action, including damages"); *Disher v. Information Resources, Inc.*, 691 F.Supp. 75, 79 (N.D.Ill.1988) (Hart, J.), *aff'd*, 873 F.2d 136 (7th Cir.1989) (the plaintiff's securities

---

**7.** FMC's federal claims as alleged in the first amended complaint are as follows:

Counts I through V charge violations of federal securities laws. All of these counts, except Count IV, are brought against all defendants. Count I is brought under section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder. This count alleges that defendants either singly, by aiding and abetting, or by conspiring, made untrue statements of material fact and omitted to state material facts in connection with the purchase and sale of FMC stock. In addition, Goldman, Shearson, and Drexel are charged as "controlling persons" of their respective employees under section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) in connection with Count I. Count II alleges that defendants' misconduct was in connection with a tender offer and therefore violated section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e), and its attendant Rule 14e–3. Count III alleges market manipulation in violation of section 9(a) of the Exchange Act, 15 U.S.C. § 78i(a). Count IV is brought under section 18(a) of the Exchange Act, 15 U.S.C. § 78r(a), and charges that Boesky and the Affiliated Entities made false and misleading statements in the Schedule 13D. FMC claims it relied upon these statements in executing its recapitalization. Finally, in Count V, FMC alleges that the same conduct that violated Rule 10b–5 violated section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

Counts VI through VIII are the RICO counts. Count VI is against defendants Boesky, Brown, Sokolow, Levine and the Affiliated Entities, and claims that those defendants violated sections 1962(a) and (d) of RICO, 18 U.S.C. §§ 1962(a), (d). Count VII alleges that all defendants violated sections 1962(c) and (d), 18 U.S.C. §§ 1962(c), (d); and Count VIII charges all defendants with violating sections 1962(b), (c) and (d), 18 U.S.C. §§ 1962(b), (c), (d).

The remaining counts allege various common law violations, including fraud by all defendants and negligence by Goldman, Shearson, and Drexel (because their employees leaked confidential information to Boesky).

fraud claim was dismissed because he failed to show that he suffered any damage).

The same is true for claims brought under RICO. *See Kaiser Cement Corp. v. Fischbach and Moore, Inc.*, 793 F.2d 1100, 1104 (9th Cir.), *cert. denied*, 479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 384 (1986) (Actual "[i]njury is ... the sine qua non of recovery by plaintiff on every one of its other theories of recovery [including RICO]"); *Flaherty*, 623 F.Supp. at 58 (actual compensable injury to the plaintiff's property must be alleged). The defendants assert that FMC has failed to allege an injury which caused it actual economic damages.

FMC makes a claim for $235 million in actual and consequential damages in its amended complaint. Amended Complaint, 33 at ¶ 64, 56 at ¶ 1. The actual damages accrued when the defendants' wrongful conduct caused FMC to pay approximately $220 million more in connection with its recapitalization than it otherwise would have. FMC also claims the expenses incurred in generating the misappropriated confidential information as part of its damages.[8] The consequential damages include attorneys' and directors' fees and expenses that were incurred when revising and consummating the recapitalization as well as costs and expenses that FMC incurred while assisting the SEC with its investigation of the defendants' activities. FMC seeks to recover the $20 million that the defendants Boesky and Boesky Entities realized on account of their purchase and sale of FMC's common stock. Finally, FMC seeks the return of the $17.5 million in fees that it paid to the defendant Goldman for the services Goldman rendered in connection with the recapitalization.

■ As all parties agree,[9] the Seventh Circuit did not comment on FMC's damage theories. *FMC II*, 852 F.2d at 994. This court did address these theories and found that FMC was not damaged or injured by the recapitalization. *FMC I*, 673 F.Supp. at 247–51 (and cases cited within). As the court previously stated, the economic effect of the recapitalization can "properly be viewed as a distribution of part of FMC's assets to the owners of those assets in exchange for their giving up a part of their equity interest to management." *Id.* at 250. Moreover, "where the shareholders decide to distribute to themselves the assets of the corporation on a pro rata basis, absent an erosion of the asset base in such a manner as to impinge upon the rights of creditors, no one has been harmed, so the corporation has suffered no injury." *Id.* at 250–51. In this case, "all of the shareholders benefited from the transactions, and there are no allegations of harm to creditors of FMC." *Id.* at 251. Drexel's metaphor remains apt: FMC seeks to shift corporate assets from the left pocket to the right pocket, and then to refill the left pocket by a recovery from the defendants.

In response to the defendants' argument, FMC first relies on language from the Seventh Circuit's opinion. *FMC II*, 852 F.2d at 994. FMC, in the court's view, has misapprehended the scope of the Seventh Circuit's holding. The Seventh Circuit held that FMC has alleged an injury—the misappropriation of its confidential information—and that this injury is redressable by damages. *Id.* The court did not hold that any of the specific damage theories advanced by FMC are viable. This court's prior finding that FMC itself was not damaged by the recapitalization was not reviewed.

---

**8.** The defendants contend that this damage claim is not pled within the amended complaint and thus should not be considered on this motion to dismiss. *See Yuknis v. Atherton*, 668 F.Supp. 1173, 1175 n. 2 (N.D.Ill.1987) (Nordberg, J.). While they are correct insofar as FMC does not explicitly make a claim for such damages, the court finds that the complaint, construed most liberally, does encompass these damages. *See* Amended Complaint, ¶ 64(d) ("FMC incurred additional costs and expenses, including attorneys' fees and expenses, di-

rectors' fees and expenses, and *other fees and expenses incurred in* revising and *ultimately consummating the recapitalization....*") (emphasis added).

FMC is given twenty-one (21) days from the entry of this order to amend its complaint to more explicitly allege this claim for damages as well as to make any other modificiations it deems necessary in light of the court's rulings.

**9.** *See* FMC's Response at 58.

Thus, this finding is not foreclosed by the Seventh Circuit's opinion. FMC also relies on the Second Circuit's decision in *International Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir.), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974) to support its position. The court finds that the *Vesco* decision is distinguishable on this point for the reasons stated in its earlier opinion. *See FMC I*, 673 F.Supp. at 248–49.[10]

In *Vesco*, the Second Circuit focused on the question of whether the plaintiff International Controls Corporation's ("ICC") transactions could be considered "sales" within the meaning of § 10(b). *Id.* at 248. The Second Circuit found that one of the transactions in question could be considered a "sale" because it caused the erosion of ICC's asset base to the possible detriment of the corporation's creditors. *Vesco*, 490 F.2d at 1346. Moreover, the transaction, a portfolio security dividend, had a significant effect on ICC as well. *See In re Penn Central Securities Litigation*, 494 F.2d 528, 534–35 n. 7 (3d Cir.1974) (discussing *Vesco*). By virtue of the transaction, ICC lost control of the assets held by a corporation that had previously been one of ICC's wholly owned subsidiaries. *Id.* Thus, in contrast to this case, both the plaintiff corporation and its creditors were harmed by the transaction in question.

■ FMC's failure to demonstrate that it was harmed by the recapitalization directly or indirectly forecloses most of its other damage claims. For example, FMC claims that it was damaged by the increased debt that it incurred to finance the revised recapitalization. As the court previously held, if the distribution of the additional $220 million in connection with the revised recapitalization did not harm FMC, "the court does not see how FMC can claim injury for choosing to fund the distribution by borrowings, rather than by selling of assets." *FMC I*, 673 F.Supp. at 249. Moreover, "FMC's Board ... had urged

that the increased debt would *benefit* stockholders in recommending that they vote for the recapitalization proposal." *FMC II*, 852 F.2d at 985 n. 11 (citing to the Amended Complaint, Exhibit K at 13).[11] FMC's Board believed that the corporation could support "substantially more indebtedness than [w]as presently outstanding." *Id.* Furthermore, the Board realized that incurring the debt would offer benefits to FMC itself as well as to the stockholders. *Id.; see generally, British Printing & Communication Corp. v. Harcourt Brace Jovanovich, Inc.*, 664 F.Supp. 1519, 1529 (S.D.N.Y.1987). For these reasons, the court finds that the increased debt incurred as a consequence of the revised recapitalization did not damage FMC as a matter of law.

■ FMC's attempt to recover damages for the other expenses related to the recapitalization is flawed for similar reasons. While consequential damages are recoverable under the securities laws, such damages must be caused by the defendants' violation of the pertinent provision of law. *See Madigan, Inc. v. Goodman*, 498 F.2d 233, 238 (7th Cir.1974) ("buyers defrauded under the Securities Exchange Act are entitled to consequential damages"); *Maryville Academy v. Loeb Rhoades & Co., Inc.*, 530 F.Supp. 1061, 1066 (N.D.Ill.1981), *quoting Foster v. Financial Technology, Inc.*, 517 F.2d 1068, 1071 (9th Cir.1975) (to recover consequential damages "[t]he plaintiff must show 'with reasonable certainty that such damages were caused by the defendants' 10b–5 violation' "). Thus, if FMC has failed to properly allege a cause of action under the securities laws, it may not recover these consequential damages. These expenses were incurred incident to the recapitalization. If, as this court held above, the recapitalization did not cause FMC to suffer actual economic damage, then these expenses cannot be re-

10. The court notes that the *Vesco* decision is more supportive of FMC's position with regard to the issue of whether it was a purchaser or seller for the purposes of § 10(b). However, as will be discussed later, *Vesco* is distinguishable in this context as well.

11. The court notes that it is "not obligated ... to ignore any facts set forth in the complaint that undermine the plaintiff's claim." *Gray*, 854 F.2d at 182.

covered under the securities laws as a matter of law.

■ However, FMC fares somewhat better with its claim for the expenses incurred in generating the misappropriated information. As the Seventh Circuit noted, "Goldman's Brown took FMC's confidential information in violation of the parties' contract, passed it along through the illegal trading ring to Boesky, and, in the process, *destroyed whatever value it had in FMC's hands." FMC II,* 852 F.2d at 991 n. 21 (emphasis added). Whatever value the misappropriated property had to FMC, it stands to reason this information would have been worth at least what FMC paid to create it. Thus, FMC has adequately alleged a compensable injury to its property for the purposes of the RICO statute. Accordingly, the defendants' motion to dismiss the RICO counts on this ground is denied.[12] As a result, the motion to dismiss FMC's state common law claims, which is based on this court's supposed lack of pendent jurisdiction, is also denied.

FMC further contends that its common law breach of fiduciary duty claim for $17.5 million in damages against Goldman and Brown provides it with standing to pursue its federal securities law claims. The court does not agree with the above proposition notwithstanding the fact that FMC may well have adequately alleged its breach of fiduciary duty claim. It is axiomatic that "[n]ot 'all breaches of fiduciary duty in connection with a securities transaction' ... come within the ambit of Rule 10b–5." *Dirks v. S.E.C.,* 463 U.S. 646, 654, 103 S.Ct. 3255, 3261, 77 L.Ed.2d 911 (1983), *quoting Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 472, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977). The conduct which causes the breach of fiduciary duty must also establish the elements of a federal securities law violation. *See Dirks,* 463 U.S. at 653–54, 103 S.Ct. at 3260–61; *see also Atchley v. Qonaar Corp.,* 704 F.2d 355, 358–59 (7th Cir.1983). Thus, the plain-

tiff must suffer actual damages in connection with the purchase or sale of a security. *See Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 194 (3d Cir.1976); *In re Investors Funding Corp. of New York Securities Litigation v. Dansker,* 523 F.Supp. 533, 539 (S.D.N.Y.1980) (citing to *Rochelle v. Marine Midland Grace Trust Co.,* 535 F.2d 523 (9th Cir.1976)). In *Dansker,* the court held that damages suffered as a consequence of corporate mismanagement and the breach of fiduciary obligation could not support the plaintiff's federal securities law claims when these damages did not occur in connection with the purchase and sale of securities. *Dansker,* 523 F.Supp. at 539–40. The Third Circuit reached a similar result in *Tully. Tully,* 540 F.2d at 194.

■ In this case, FMC contends that the defendants' breach of fiduciary duty caused FMC to suffer $235 million damages in connection with the revised recapitalization. As will be discussed below, FMC did not "purchase" or "sell" securities for the purpose of the Exchange Act during its recapitalization. *See infra,* at 1193–96. Consequently, the defendants' breach of fiduciary duty did not occur in connection with the purchase and sale of a security. Thus, FMC's damages would be based on the defendants' breach of duty rather than on damages suffered when it purchased or sold securities. *Tully,* 540 F.2d at 194. For these reasons, the common law claim does not provide FMC with standing to pursue its federal securities law claims.

■ FMC also contends that it should be reimbursed for the costs and expenses incurred in assisting the SEC with its investigation of the defendants' conduct. No authority is cited in support of this proposition. The defendants cite several cases which suggest that such costs may not be recovered. *See Hurtado v. United States,* 410 U.S. 578, 588–89, 93 S.Ct. 1157, 1163–64, 35 L.Ed.2d 508 (1973); *United States v. Southwestern Bank and Trust Co.,* 693

---

**12.** The injury does not, however, provide FMC with standing to pursue its securities law claims. As will be explained below, the breaches of contract and fiduciary duty which led to

the misappropriation of FMC's property did not occur in connection with the purchase or sale of securities.

F.2d 994, 996 (10th Cir.1982); *S.E.C. v. Arthur Young & Co.*, 584 F.2d 1018, 1033 (D.C.Cir.1978), *cert. denied*, 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979). These cases discuss the responsibility of citizens to respond to government process even if they must incur some economic burden in doing so. Another decision, *S.E.C. v. Higgins*, No. 86–8204–CIV (S.D.Fla. January 19, 1988), is somewhat more helpful. In *Higgins*, the court rejected one party's attempt to recover the costs incurred when it cooperated with the SEC's investigation of the defendants. *Id.* This court finds that FMC may not recover the costs incurred in assisting with the S.E.C.'s investigation of the defendants as a matter of law.

■ Finally, FMC contends that it should have standing to recover the Boesky Entities' illegally obtained profits even in the absence of any out-of-pocket loss. FMC's Response, at 66. In its earlier opinion, this court considered the principles which underlie the prohibitions on insider trading and concluded that FMC lacked standing to sue for the return of the $20 million in illegally obtained profits. *See FMC I*, 673 F.Supp. at 251. The court will adhere to its original determination for the following reasons. First, as FMC concedes and the cases it cites amply illustrate, a corporation that has not purchased or sold securities lacks standing to recover an insider trader's profits under § 10(b). *See* FMC's Response, at 69–70 (and cases cited within). FMC lacks standing to recover the Boesky Entities' profits because it was neither a purchaser nor a seller of securities for the purposes of the Exchange Act. *See infra*, at 1193–96. Disgorgement is "a rescissionary measure of damages intended to place a defrauded seller [or purchaser] in the same position he would have had occupied had the [defendant's] fraud not induced him to enter the transaction." *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1241 (7th Cir.1988). Second, FMC does not allege that Boesky traded with information superior to that possessed by FMC. *See FMC II*, 852 F.2d at 991 n. 20; *FMC I*, 673 F.Supp. at 251, *quoting Freeman v. Decio*,

584 F.2d 186, 189 (7th Cir.1978) ("The securities laws prohibit insider trading 'because it is unfair to other investors who do not enjoy the benefits of access to inside information'"). Boesky, at best, had information equal to that possessed by FMC.

The court's finding that FMC did not suffer any actual economic loss under the securities laws in connection with the recapitalization supplies another reason to deny FMC standing to recover Boesky's illegal profits. Allowing FMC to recover Boesky's ill-gotten gains would allow a disfavored windfall. *See Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Co.*, 417 U.S. 703, 715–17, 94 S.Ct. 2578, 2585–86, 41 L.Ed.2d 418 (1974). In addition, the investors who may have been injured in a manner encompassed by the insider trading prohibitions [13] have filed a class action suit on their own behalf. *See In re Ivan F. Boesky Securities Litigation*, No. M21–45–MP (S.D.N.Y.). When the investors who are the true victims of insider trading "in fact bring an action seeking damages from the insiders, ... the need for a surrogate plaintiff [such as FMC] disappears...." *Freeman*, 584 F.2d at 195. For the above reasons, FMC's failure to establish that it may recover actual damages for the purported violations of the federal securities laws mandates the dismissal of its securities law claims.

## III

*Sections 10(b), 9(a) and 18(a): FMC Was Not a Purchaser or Seller of Securities*

■ The defendants move to dismiss Counts I, III, and IV which allege violations of § 10(b) and Rule 10b–5, § 9(e), and § 18(a) of the Exchange Act on the grounds that FMC was not a purchaser or seller of securities. FMC must adequately allege that it purchased or sold securities to recover under each of these provisions. 15 U.S.C. §§ 78j(b), 78i(b), 78r(a); *Pelletier*, 863 F.2d at 1555 (addressing § 10(b)); *Richardson v. Shearson/American Express Co., Inc.*, 573 F.Supp. 133, 136 (S.D.

---

13. *See FMC I*, 673 F.Supp. at 251.

N.Y.1983) (addressing § 9(e)); *Rankow v. First Chicago Corp.*, 678 F.Supp. 202, 207 (N.D.Ill.1988) (Bua, J.), *rev'd on other grounds*, 870 F.2d 356 (7th Cir.1989) (addressing § 18(a)); Loss, *Fundamentals of Securities Regulations*, 922 (1988) (same). This court previously held that FMC was not a purchaser or seller of securities with regard to the recapitalization in its earlier opinion. *See FMC I*, 673 F.Supp. at 250. The court will reaffirm its earlier decision for the following reasons.[14]

FMC contends that it was a purchaser and seller of securities during the share exchanges which accompanied its recapitalization. Accordingly, the court will focus on whether these exchanges bring the transaction at issue within the purview of the securities laws. When making the determination of whether a particular transaction is a purchase or sale, the court must ascertain whether "'the transaction wrought a fundamental change in the nature of the plaintiff's investment.'" *Carter v. Signode Industries, Inc.*, 694 F.Supp. 493, 497 (N.D.Ill.1988) (Aspen, J.), *quoting Keys v. Wolfe*, 709 F.2d 413, 417 (5th Cir.1983) (quoting *Rathborne v. Rathborne*, 683 F.2d 914, 920 (5th Cir.1982)). "It is well established that the share exchange accompanying the merger of two separate and distinct corporate entities, pursuant to which shareholders in one or both of the original entities exchange their shares in [a] surviving or newly created corporation, constitutes a 'purchase or sale' of securities." *Penn Central*, 494 F.2d at 533; *Schnorbach v. Fuqua*, 70 F.R.D. 424, 439 (S.D.Ga.1975); *see also Rathborne*, 683 F.2d at 920–21 (fundamental change occurs when the plaintiff is left "with shares that represent a participation in [a] wholly new and different enterprise").[15]

■ In "a merger between two corporations, the original shareholders of each cor-poration end up with stock in a substantially different company with substantially different assets and prospects." *Penn Central*, 494 F.2d at 534. Consequently, "[t]he decision to vote in favor of the merger is ... little different from the decision to sell shares in the original corporation and with the cash received for these shares, buy shares in the merged corporation." *Id.* A corporation also becomes a "substantially different" entity when it changes from nonprofit status to for profit status with broader corporate powers. *See Ahern v. Gaussoin*, 611 F.Supp. 1465, 1478 (D.Ore.1985). The extension of the securities laws to these transactions promotes the remedial purposes of the statutes. *Penn Central*, 494 F.2d at 534.

On the other hand, courts have recognized that "'Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.'" *Id., quoting Superintendent of Insurance of New York v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). In *Penn Central*, the shareholders of Penn Central Company voted to exchange their shares on a share for share basis in a newly created holding company. The Third Circuit found that the transaction, which "was in effect an 'internal corporate management' decision which only incidentally involved an exchange of shares," was outside of the purview of § 10(b) notwithstanding the numerous ways in which the shareholders were affected. *Penn Central*, 494 F.2d at 534–35. The shareholders, for example, lost their appraisal rights and the ability to intervene in a subsequent bankruptcy proceeding. *Id.* Moreover, the holding company was given the opportunity to diversify in ways not previously available to the original company. Finally, the

---

**14.** The court notes a plaintiff's failure to qualify as a purchaser or seller can be established by the defendants on a motion to dismiss. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 742, 95 S.Ct. 1917, 1928, 44 L.Ed.2d 539 (1975).

**15.** A fundamental change in the nature of an investment also occurs when the plaintiff's in-vestment changes from "an interest in a going enterprise to a right solely for payment of money for [its] shares." *Sargent v. Genesco, Inc.*, 492 F.2d 750, 765 (5th Cir.1974); *Yabsley v. Conover*, 644 F.Supp. 689, 699 (N.D.Ill.1986) (Kocoras, J.) (same); *Rodriguez Cadiz v. Mercado Jimenez*, 579 F.Supp. 1176, 1180 (D.P.R.1983) (same).

classes of stock, preemptive rights, par value, stated value, and the classes and terms of directors were all altered. *Id.* at 534 n. 6a.

This court must determine whether FMC's recapitalization "was in effect an 'internal corporate management' decision which only incidentally involved an exchange of shares or in effect [was] a major corporate restructuring requiring the same kind of investment decision by the shareholders as would a proposed merger with a separate existing corporation." *Id.* at 534. FMC contends that the recapitalization was a major corporate restructuring for two main reasons. First, FMC directs the court's attention to the change in the proportionate equity interests of the three groups of FMC shareholders. Prior to the recapitalization, the public shareholders held 80.69 percent of the equity interest in FMC. Amended Complaint, Exhibit K, at 15. The management shareholders held 10.72 percent of the equity interest. *Id.* Finally, FMC's Thrift Plan held 8.59 percent of the equity interest. Pursuant to the recapitalization plan, the public shareholders exchanged each share of old FMC stock for $80 cash and one share of new FMC stock; the management shareholders exchanged each share of old FMC stock for no cash and 5.667 shares of new FMC stock; and the Thrift Plan would exchange each share of its old FMC stock for $25 cash and 4.209 shares of new FMC stock. The above exchanges resulted in the public shareholders holding 59.51 percent of the equity interest after the recapitalization, the management shareholders holding 13.82 percent, and the Thrift Plan holding 26.67 percent. FMC also contends that its corporate structure has been changed by its assumption of $2 billion of debt in connection with the restructuring.

The factual circumstances here make this case distinguishable from the majority of the cases cited by FMC. In several of these cases, the corporate plaintiff was a purchaser or seller because it exchanged cash for shares of stock. *See Alabama Farm Bureau Mutual Casualty Co., Inc. v. American Fidelity Life Insurance Co.,* 606 F.2d 602, 606 (5th Cir.1979), *cert. denied,* 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980) (the corporate plaintiff repurchased its own stock for cash); *Bankers Life & Casualty Co.,* 404 U.S. at 8–9, 92 S.Ct. at 166–67 (the plaintiff corporation was a seller when it exchanged its treasury bonds for cash); *Wright v. Heizer Corp.,* 560 F.2d 236, 247 (7th Cir.1977); *cert. denied,* 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978) (the corporation was a seller when it issued stock to an investor for inadequate consideration); *Schoenbaum v. Firstbrook,* 405 F.2d 215, 218–19 (2d Cir.1968) (en banc), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969) (a corporation was a seller when it sold shares of its treasury stock to another corporation for vastly inadequate cash consideration).[16]

FMC cites two other cases that are more pertinent yet are ultimately distinguishable as well. *See Vesco,* 490 F.2d at 1346; *Dasho v. Susquehanna Corp.,* 380 F.2d 262, 266 (7th Cir.), *cert. denied,* 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967). The *Vesco* decision does, as FMC contends, demonstrate that a corporation may be injured by a fraudulently-induced distribution of corporate assets to shareholders. However, as stated above, there is a crucial distinction between *Vesco* and this case. *See supra,* at 1190–91. In *Vesco,* the distribution caused the corporation to lose control of assets that it had previously controlled. Consequently, the distribution injured the corporation by eroding its asset base. *See In re Penn Central,* 494 F.2d at 534–35 n. 7. In this case, FMC's asset base

---

**16.** Two other cases cited by FMC are also plainly distinguishable. *See Gross v. Diversified Mortgage Investors,* 431 F.Supp. 1080, 1083 (S.D. N.Y.1977), *aff'd without opinion,* 636 F.2d 1201 (2d Cir.1980) (trust beneficiary on whose behalf shares were purchased has standing as a purchaser); *Franklin Life Insurance Co. v. Commonwealth Edison Co.,* 451 F.Supp. 602, 608 (S.D.Ill.1978), *aff'd,* 598 F.2d 1109 (7th Cir.), *cert. denied,* 444 U.S. 900, 100 S.Ct. 210, 62 L.Ed.2d 136 (1979) (the plaintiff corporation was a purchaser when it bought preferred stock of the defendant corporation in connection with an underwriting offer and subsequent redemption for cash).

was not eroded by the recapitalization. *FMC I*, 673 F.Supp. at 250–51. Consequently, FMC was not injured by the recapitalization in the manner discussed in *Vesco*. In *Dasho*, one corporation's issuance of its shares in exchange for the shares and assets of another corporation constituted a sale. *Dasho*, 380 F.2d at 266. This exchange of securities was incidental to a merger. *Id.* As stated above, a merger is the type of major corporate restructuring that allows incidental exchanges of securities to be deemed purchases or sales for the purpose of securities law. *See supra* at 1194–95.

In this case, the main effect of the recapitalization was to shift the proportionate equity interests held by the three classes of shareholders. FMC's recapitalization was not a typical one. *See FMC I*, 673 F.Supp. at 250; Jacobs, *Litigation and Practice Under Rule 10b–5*, § 117.02, at 5–81 (2d ed. 1985) ("a recapitalization is not a purchase or sale since a stockholder's economic interest remains unchanged"). Nevertheless, several courts have held that diminution or augmentation of a party's equity interest in an ongoing concern does *not* constitute a fundamental change in that party's investment. *Ray v. Karris*, 780 F.2d 636, 640 n. 1 (7th Cir.1985) (citing to *Sargent*, 492 F.2d at 764–65); *Schnorbach*, 70 F.R.D. at 439 (a major corporate restructuring was not found notwithstanding the fact that, among other things, the shareholder's equity interest increased by 9 percent); *Canadian Javelin, Ltd. v. Brooks*, 462 F.Supp. 190, 195–96 (S.D.N.Y.1978); *Union Carbide Corp. Consumer Products Business Securities Litigation*, 676 F.Supp. 458, 477 (S.D.N.Y.1987) (citing to *Sargent* and *Javelin*); *Rodriguez Cadiz*, 579 F.Supp. at 1181 (citing to *Javelin*).

 Thus, the fact that the exchanges of stock incident to the recapitalization resulted in a shift in the proportionate equity interests of the three classes of FMC shareholders does not demonstrate

that FMC was a purchaser or seller of securities. Indeed, FMC's public shareholders retained a substantial and controlling interest in the corporation. *Cf. Javelin*, 462 F.Supp. at 192, 195–96. Moreover, FMC's assumption of the debt did not convert it into a "substantially different entity." *See supra*, at 1191 (discussion of the effects of the additional debt). Accordingly, Counts I, III, and IV of the amended complaint must be dismissed for this reason as well.

## IV

### *Section 9(a): FMC Failed to Sustain the Requisite Damage*

 The defendants move to dismiss Count III alleging the violation of § 9(a) of the Exchange Act for the following additional reason. The defendants contend that FMC will be unable to establish damages under § 9(a) even if it is able to show that it was a purchaser or seller of securities and that the defendants manipulated the price of FMC's stock. Under § 9, a plaintiff may seek "recovery for an improper premium" added to the amount paid for the stock subject to the manipulative activity. *Piper v. Chris–Craft Industries, Inc.*, 430 U.S. 1, 46, 97 S.Ct. 926, 951, 51 L.Ed.2d 124 (1977); *see also* Loss, *Fundamentals of Securities Regulations*, 920 (1988). The defendants' argument is predicated on the fact that the price of FMC's stock has not declined and has actually risen since the recapitalization. *See* Northview's Reply, at 14 (citing to Standard and Poor's Stock Guide, June 1987 at 12).[17]

FMC acknowledges that the price of its stock has risen. FMC's Response, at 39. However, it attempts to rebut the defendants' argument by citing to a variety of factors that have purportedly caused the price of FMC's stock to rise. Amended Complaint, ¶ 58. The speculation that these other factors may have led to an increase in the stock's price is immaterial.

17. The court notes that it may take judicial notice of stock prices pursuant to Federal Rule of Evidence 201(f) when ruling on this motion. *See Baumel v. Rosen*, 283 F.Supp. 128, 144 n. 8 (D.Maryland 1968), *aff'd in part, rev'd in part on*

*other grounds*, 412 F.2d 571 (3d Cir.1969), *cert. denied*, 396 U.S. 1037, 90 S.Ct. 681, 688, 24 L.Ed.2d 681 (1970); Weinstein & Berger, 1 *Weinstein's Evidence*, ¶ 201[06], at 201–47 (1988); Fed.R.Evid. 201(f).

The fact that the price of FMC's stock has risen after the recapitalization demonstrates that FMC did not pay an "improper premium" when it "purchased" the old FMC stock from the public shareholders in the course of the recapitalization. The assertion that FMC might have "purchased" the old FMC stock for a lower price but for the defendants' interference is of no consequence as long as FMC was not damaged by the purchase price it actually paid. *See Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 303 F.2d 527, 533 (10th Cir.1962). For "the question is not what [FMC] might have gained, but what [it] has lost by being deceived into the purchase." *Id.* (the defendants' liability "does not include the expectant fruits of an unrealized speculation"); *Madigan,* 498 F.2d at 239–40 (a defrauded buyer is not entitled to the recovery of lost profits). FMC's failure to allege facts showing that it was damaged in a manner compensable under § 9 mandates the dismissal of Count III.

V

*Section 17(a): No Implied Private Right of Action*

■ The defendants move to dismiss Count V of the amended complaint which alleges a violation of § 17(a) of the Exchange Act. Count V will be dismissed because there is no implied private right of action under § 17(a) in the Seventh Circuit. *See Schifke v. Seafirst Corp.,* 866 F.2d 935, 942–43 (7th Cir.1989).[18]

VI

*Section 14(e): FMC's Recapitalization was not a Tender Offer*

■ The defendants move to dismiss Count II of the amended complaint which alleges a violation of § 14(e) of the Exchange Act ("Williams Act"). The Williams Act proscribes fraudulent or manipulative activity in connection with a

tender offer. 15 U.S.C. § 78n(e). The defendants move to dismiss Count II on the grounds that FMC's recapitalization is not a "tender offer" as the term has been construed for the purposes of the Williams Act. The court agrees and finds that this deficiency also compels the dismissal of Count II.

The Williams Act contains no statutory definition of the term tender offer. *See Dyer v. Eastern Trust and Banking Co.,* 336 F.Supp. 890, 907 (D.Me.1971). Courts have reviewed the legislative history to determine what sort of activity that the Williams Act was designed to regulate. As the Seventh Circuit has noted, the Williams Act was "passed in 1968 in response to the growing use of cash tender offers as a means for achieving corporate takeovers." *Indiana National Corp. v. Rich,* 712 F.2d 1180, 1183 (7th Cir.1983); *see also Dyer,* 336 F.Supp. at 907 ("The legislative history ... makes it clear that the type of activity intended to be regulated by Section 14(e) ... is the acquisition of control of a corporation by outsiders through the purchase of its shares").

Tender offers typically involve a contest for control of the corporation. *See Rich,* 712 F.2d at 1181, 1183; *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 598–99 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974) (citing *Dyer*); *Dyer,* 336 F.Supp. at 907; *S.E.C. v. Texas International Co.,* 498 F.Supp. 1231, 1240 (N.D.Ill.1980) (Marshall, J.); *see generally Panter v. Marshall Field & Co.,* 646 F.2d 271, 285–86 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); Loss, *Fundamentals of Securities Regulations,* 497 (1988) ("There are two ways to capture control of an unwilling target company: proxy contests and tender offers"); Case note, Problems in Defining "Tender Offer" 17 Loyola (Ill.) L.J. 693, 696–700 (1986). As the Fifth Circuit stated in *Smallwood,* "a corporation does not become a tender offeror simply by proposing a paper exchange of securities. There

---

**18.** Furthermore, "even if an implied private right of action were available under section 17(a), [FMC] could not state a claim in this case because 'this section and Rule 10b–5 track each

other closely, [and] the lack of a 10b–5 cause of action would preclude section 17(a) relief also.'" *Schifke,* 866 F.2d at 943, *quoting Ray,* 780 F.2d at 641 n. 3.

must be contemplated some change of control. If actual control does not shift, it is difficult to see why the shareholder needs the protection of Section 14(e)." *Smallwood,* 489 F.2d at 599.

Tender offers typically share several other characteristics as well. *See Wellman v. Dickinson,* 475 F.Supp. 783, 823–24 (S.D.N.Y.1979), *aff'd,* 682 F.2d 355 (2d Cir.1982), *cert. denied,* 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983). In *Wellman,* the court found that tender offers are often characterized by some or all of the following elements:

> (1) active and widespread solicitation of public shareholders for the shares of an issuer; (2) solicitation made for a substantial percentage of the issuer's stock; (3) offer of purchase made at a premium over the prevailing market price; (4) terms of the offer are firm rather than negotiable; (5) offer contingent on the tender of a fixed maximum number to be purchased; (6) offer open only a limited period of time; (7) offeree subjected to pressure to sell his [or her] stock ... [and (8)] the public announcements of a purchase program precede or accompany rapid accumulation of large amounts of the target company's securities.

*Id.; S.E.C. v. Carter Hawley Hale Stores, Inc.,* 760 F.2d 945, 950 (9th Cir.1985) (the court endorses the *Wellman* factors).

After reviewing the facts as alleged in the amended complaint along with the attached exhibits, the court finds that FMC's recapitalization was not a "tender offer" for the following reasons. First, the court finds FMC's proxy statement/prospectus, which is attached to the amended complaint as Exhibit K, to be most revealing of the true nature of the stock exchange. The proxy statement/prospectus states in part that

> [i]n the normal process of formulating the Company's (FMC's) business and financial plans, members of the Company's management regularly conduct studies of the Company's long-term prospects in the light of an anticipated general economic and business conditions and management's forecasts for the specific

businesses in which the Company is engaged. In recent years, management has considered a number of alternatives designed to maximize shareholder values in view of the Company's strong financial position, its record of sustained cash flow and the relatively mature, low-growth nature of its principal businesses. These alternatives have included a *recapitalization* of the Company, a leveraged buy-out transactions, *a repurchase of Shares* in the open market or *through a tender offer* and significant acquisitions of new businesses....

> In early 1986, after considering these alternatives, the Company's management and Board of Directors concluded that long-term stockholder values would be maximized through a *recapitalization* of the Company that would create a more leveraged capital structure....

Amended Complaint, Exhibit K, cover letter at viii, 33 (emphasis added). The above excerpt shows that the Board considered a number of alternatives and decided to recommend a recapitalization *in lieu of* a tender offer to the shareholders.

■ Secondly, the recapitalization did not involve a change in control of FMC. *Cf. supra,* at 1197 (discussion of case law). In fact, the recapitalization was designed to "have the effect of making more difficult a change in control of the Company that is not approved by the Board of Directors." Amended Complaint, Exhibit K, cover letter at i, ix, 18–20, 31, 35. The recapitalization "was no more than a change in corporate structure." *Dyer,* 336 F.Supp. at 909. Furthermore, the plan lacks other characteristics which typify tender offers. For example, FMC does not allege that its public stockholders were in any way pressured to approve the recapitalization or that they were ill-informed about the plans implications. *See Panter,* 646 F.2d at 286 ("the distinguishing characteristic of the activity the Williams Act seeks to regulate is the exertion of pressure on the shareholders to make a hasty, ill-considered decision to sell their shares"). Moreover, the public shareholders were not offered a premium for their stock. According to paragraph 53 of the amended complaint, these shareholders

were to receive cash and new FMC stock equivalent to the current market value of their old FMC stock. *See FMC II*, 852 F.2d at 984; *see also Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 58 (2d Cir.1985) (the SEC's proposed definition of a premium is $2.00 per share or 5 percent above market price, whichever is greater). Given the above, the court finds that the recapitalization cannot be characterized as a "tender offer" under the Williams Act as a matter of law. Accordingly, Count II must be dismissed.[19]

## VII

### *Count VII: No Respondeat Superior Under RICO*

The investment banking firm defendants move to dismiss Count VII which alleges that the defendants violated §§ 1962(c) and (d) of the RICO statute. In Count VII, FMC alleges that Boesky, the Affiliated Entities, Brown, Sokolow and Levine were an "enterprise" associated in fact for the common purpose of obtaining illegal profits through a scheme to defraud. These defendants, who were either employed by or associated with the enterprise, conducted the enterprise's affairs through a pattern of racketeering. These defendants also conspired with each other and aided and abetted the statutory violation. Goldman, Shearson, and Drexel, the investment banking firms, allegedly violated § 1962(c) by knowingly authorizing, ratifying, acquiescing in, or benefiting from the other defendants' acts. Amended Complaint, ¶ 107.

■ The investment banking firms first contend that they may not be held liable under RICO under the doctrine of respondeat superior. Although it is not free from all doubt, it appears that the defendants have correctly stated the Seventh Circuit's position on this issue. *See D & S Auto Parts, Inc. v. Schwartz*, 838 F.2d 964, 968 (7th Cir.), *cert. denied*, 486 U.S. 1061, 108

S.Ct. 2833, 100 L.Ed.2d 933 (1988); *SK Hand Tool Corp. v. Dresser Industries, Inc.*, 852 F.2d 936, 941 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3241, 106 L.Ed.2d 589 (1989) (citing to *D & S Auto Parts*); *P.M.F. Services, Inc. v. Grady*, 687 F.Supp. 398, 399–400 (N.D.Ill.1988) (Shadur, J.) (same); *but see Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1307 (7th Cir.1987), *cert. denied*, —— U.S. ——, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989). In any event, FMC concedes the point. FMC's Response at 50–51.

FMC attempts to avoid the defendants' argument by citing to "acts described in the complaint [which] provide a reasonable basis to believe that the investment banks may have been direct participants in conduct that is part of the RICO pattern." *Id.* at 51. The acts referred to, as the defendants note, do not appear to relate in any way to the events surrounding FMC's recapitalization. *See* Amended Complaint, ¶¶ 6(c), 6(e), 21 & Exhibits C, G. Consequently, these allegations are insufficient to state a claim of primary liability under RICO against the investment banking firms. *Cf. S.E.C. v. Tome*, 638 F.Supp. 596, 625 (S.D.N.Y.1986), *aff'd*, 833 F.2d 1086 (2d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1751, 100 L.Ed.2d 213 (1988). Accordingly, the court will dismiss the Count VII RICO claims against Goldman, Shearson, and Drexel without prejudice. FMC will have the opportunity to amend its complaint to reallege these claims if, after discovery, it can do so consistent with the obligations of Rule 11.

## VIII

### *Count VIII: FMC Inadequately Alleges Aiding and Abetting and Conspiracy under RICO*

■ The investment banking firm defendants also move to dismiss Count VIII which alleges that the defendants violated

---

**19.** FMC's failure to adequately allege a violation of the federal securities laws dooms its contentions that the investment banking defendants are liable as "controlling persons" under § 20(a) of the Exchange Act. A defendant may be liable as a "controlling person" under § 20(a) only if a primary violation of the securities laws is adequately alleged. *See Schlifke*, 866 F.2d at 949, *quoting Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir.1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986).

§§ 1962(b) and (d) of the RICO statute. In Count VIII, FMC restates the allegations of Count VII and further alleges that Boesky and the Affiliated Entities "aided and abetted by Goldman, Brown, Shearson, Sokolow, Drexel, and Levine directly or indirectly acquired an interest in the common stock of FMC." Amended Complaint, ¶ 110. The investment banking firms assert that FMC has failed to adequately allege that they entered a conspiracy or that they aided and abetted any of the other defendants' illegal conduct. They are correct. " 'To state a claim for conspiracy, a plaintiff must allege the agreement of each defendant to the operation of the conspiracy.' " *First Interstate Bank*, 837 F.2d at 780, *quoting Otto v. Variable Annuity Life Insurance Co.*, 814 F.2d 1127, 1137 (7th Cir.1986); *cert. denied*, 486 U.S. 1026, 108 S.Ct. 2004, 100 L.Ed.2d 235 (1988); *Balabanos v. North American Investment Group, Ltd.*, 708 F.Supp. 1488, 1494 (N.D. Ill.1988) (Aspen, J.). FMC has failed to make the required allegation that the investment banking firms agreed to the commission of two predicate acts. *See United States v. Neapolitan*, 791 F.2d 489, 495–98 (7th Cir.), *cert. denied*, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986); *United States v. Stern*, 858 F.2d 1241, 1246–47 (7th Cir.1988). Instead FMC offers conclusory, vague, and general allegations of conspiracy. Accordingly, the conspiracy claims against these three defendants are properly dismissed. *First Interstate Bank*, 837 F.2d at 780.

FMC's aiding and abetting allegations against these three defendants are similarly infirm. The Seventh Circuit has yet to express an opinion as to whether an actor may be subject to civil liability under RICO for aiding and abetting a primary violation. *See WAIT Radio v. Price Waterhouse*, 691 F.Supp. 102, 108 (N.D.Ill. 1988) (Grant, S.J.). Nevertheless, "the Third and Fifth Circuits agree that the common law doctrine of aiding and abetting ... can apply to RICO if the other RICO criteria are met." *Id.* (citing to *Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1356, 1359–60 (3d Cir.1987) and *Armco Industrial Credit Corp. v. SLT Warehouse Co.*, 782 F.2d 475, 485–86 (5th Cir.1986)). When discussing an aiding and abetting claim under the securities laws, the Seventh Circuit cited to a Second Circuit decision where the elements of this claim were delineated. *See Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 496 (7th Cir.1986) (citing to *ITT, International Investment Trust v. Cornfeld*, 619 F.2d 909, 922 (2d Cir.1980)).

In *Cornfeld*, the Second Circuit stated that aiding and abetting liability may be found where there is 1) the existence of a violation by primary party (as opposed to party charged with aiding and abetting), 2) "knowledge" of the violation on the part of the aider abettor, and 3) "substantial assistance" by the aider and abettor in the achievement of the primary violation. *Cornfeld*, 619 F.2d at 922. " '[S]ubstantial assistance' means more than just a little aid." *Barker*, 797 F.2d at 495; *see also WAIT*, 691 F.Supp. at 108 (citing to *Armco*) (liability is not shown by mere acquiescence; rather a defendant must commit an overt act designed to aid in the success of the venture). To put it another way, "to be held liable as an aider and abettor, a person must 'in some sort associate himself with the venture, ... participate in it as something that he wishes to bring about, [and] seek by his action to make it succeed.' " *Cornfeld*, 619 F.2d at 922, *quoting United States v. Peoni* 100 F.2d 401, 402 (2d Cir.1938) (L. Hand, J). Finally, aiders and abettors "may be liable only if they have the same mental state required for primary liability." *Barker*, 797 F.2d at 495; *WAIT*, 691 F.Supp. at 108.

The parties' dispute whether FMC has alleged its aiding and abetting claims with enough detail. Federal Rule of Civil Procedure 9(b) obligates the plaintiff "to state each of the elements of aiding and abetting liability with sufficient particularity to give defendant[s] adequate notice of the exact nature of the fraud claimed so that [they] can formulate adequate responses." *Kirshner v. Goldberg*, 506 F.Supp. 454, 458 (S.D.N.Y.1981), *aff'd without opinion*, 742 F.2d 1430 (2d Cir.1983) *Hokama v. E.F. Hutton & Co., Inc.*, 566 F.Supp. 636, 646

(C.D.Cal.1983) (same) *Zatkin v. Primuth,* 551 F.Supp. 39, 42 (S.D.Cal.1982) (same). "Unadorned allegations that [the defendants] knew of the primary violation and rendered substantial assistance ... will not suffice to satisfy the strictures of Rule 9(b)." *Kirshner,* 506 F.Supp. at 458. FMC's allegations fall into the above category and, thus, are insufficient. Curiously, the portion of the complaint which, according to FMC, shows that Goldman, Shearson, and Drexel knowingly authorized, ratified, acquiesced in or benefited from the other defendants' illegal conduct does not refer to the firms in any way except as the employers of some of the individual defendants. FMC's Response at 54 (citing to the Amended Complaint, ¶¶ 34–36). Furthermore, Drexel's and Goldman's involvement in Boesky's other schemes cannot cure the weakness of FMC's allegations with regard to this scheme.

Finally, the amended complaint does not clearly allege how the firms were benefited by the other defendants' conduct. *Cf.* Amended Complaint, ¶ 65(a) (Boesky's wrongful profit is alleged). Brown, Sokolow, Levine, Boesky, and the Affiliated Entities, according to FMC, acted for their own individual and collective benefit. Amended Complaint, ¶ 34. If anything, the individual defendants' conduct harmed their employers by subjecting them to potential liability and, in the case of Goldman, by jeopardizing contingent fees.[20] For these reasons, the court will dismiss the RICO conspiracy and aiding and abetting claims that are brought against Goldman, Shearson, and Drexel in Count VIII. As stated in connection with Count VII, FMC will have the opportunity to amend its complaint to reallege these claims if such an amendment is appropriate.

## CONCLUSION

For the foregoing reasons, the court dismisses Counts I through V of the amended complaint, which allege in part violations of the federal securities laws, with prejudice.

The court further dismisses Counts VII and VIII as against the defendants Goldman, Shearson, and Drexel without prejudice. The defendants' motion to dismiss these counts, which allege RICO violations, is denied as to all other defendants. The court further denies the defendants' motion to dismiss Count VI, which also alleges the violation of RICO, as well as the defendants' motion to dismiss the various state common law claims alleged in Counts IX through XVI of the amended complaint.

FMC is given twenty-one (21) days from the entry of this order to amend its complaint in accordance with the court's instructions. *See supra,* at 1190 n. 8.

---

**20.** Goldman's $17.5 million fee was contingent on the consummation of the recapitalization. The individual defendants' conduct allegedly caused the price of FMC's stock to rise. Goldman's fee was jeopardized to the extent that the rising stock prices caused the recapitalization to appear less attractive to FMC's management.