## In re IVAN F. BOESKY SECURITIES LITIGATION.

## FMC CORPORATION, Plaintiff–Appellant,

v.

Ivan F. BOESKY; Boesky & Kinder Partners, L.P.; CX Partners, L.P., formerly known as Ivan F. Boesky & Company, L.P.; IFB Managing Partnership, L.P.; Cambrian & General Securities, P.L.C.; BH Liquidation Corporation, formerly known as Beverly Hills Hotel Corporation; Farnsworth and Hastings Limited; Northview Corporation; Seemala Partners, L.P.; Ivan F. Boesky Corporation; David S. Brown; Shearson Lehman Brothers, Inc.; Ira B. Sokolow; Drexel Burnham Lambert Incorporated; Dennis B. Levine, Defendants,

## Goldman Sachs & Co., Defendant–Appellee.

Nos. 945, 1110, Dockets 93–7433, 93–7683.

United States Court of Appeals, Second Circuit.

Argued Jan. 24, 1994.

Decided Sept. 23, 1994.

*Services Admin.,* 425 U.S. 820, 835, 96 S.Ct. 1961, 1969, 48 L.Ed.2d 402 (1976).

Thomas P. Sullivan, Chicago, IL (Richard T. Franch, Robert T. Markowski, Thomas F. Cotter, Jenner & Block, Chicago, IL, Lawrence Kill, John B. Berringer, Anderson Kill Olick & Oshinsky, P.C., New York City, of counsel), for plaintiff-appellant.

John L. Warden, New York City (Holly H. Weiss, Sullivan & Cromwell, Robert J. Lack, Robert D. Kaplan, Cameron A. Stracher, Katharine L. Sonnenberg, Friedman & Kaplan, of counsel), for defendant-appellee.

Before WALKER and JACOBS, Circuit Judges, and DALY, District Judge.*

* The Honorable T.F. Gilroy Daly of the United States District Court for the District of Connecti-

WALKER, Circuit Judge:

When the Securities and Exchange Commission filed civil securities fraud charges against Ivan Boesky in 1986, it alerted a throng of disappointed investors to the unscrupulous acts of Boesky and some of Wall Street's other infamous characters. Since then, big and small investors alike seeking to rectify wrongs suffered at Boesky's hands have been on a crusade not only against Ivan Boesky himself, but also against those alleged to have facilitated his malfeasance. The instant appeal involves one of the first actions that followed the SEC's charges against Boesky. What began as a multidefendant search by FMC Corporation ("FMC") to find responsible parties has been pared down to a focused attack on Goldman, Sachs & Co. ("Goldman"). FMC seeks to recover fees paid and alleged damages suffered when one Goldman employee prematurely disclosed a proposed FMC recapitalization to Boesky prior to public announcement of the deal and another employee allegedly disclosed confidential information about FMC's future prospects. Boesky purchased substantial amounts of FMC stock, during which time the trading price rose sharply. In the aftermath of this rise in price, FMC was forced to revise its reorganization plans, and ultimately, to pay an additional $220 million dollars to its public shareholders to consummate the transaction.

## BACKGROUND

### I. Factual Background

In March 1985, representatives of FMC began meetings with Goldman to discuss the possibility of restructuring FMC to increase the percentage of outstanding common stock held by "insiders," and to increase FMC's debt-to-equity ratio in the hopes of making FMC a less attractive takeover target. To advance the discussions, FMC provided Goldman with confidential financial projections and other business information concerning FMC's future prospects. Both parties understood that the projections as well as the

cut, sitting by designation.

fact of the proposed restructuring itself were to be kept in confidence, and that the transaction was to be discussed, even to Goldman personnel, only on a need-to-know basis. The meetings ultimately led to an agreement which promised Goldman, as FMC's investment banker, a $17.5 million fee upon the deal's successful completion.

Unbeknownst to Goldman, one of Goldman's vice-presidents, David S. Brown, informed Boesky about the planned reorganization through a channel of similarly dissolute securities professionals at other investment banks. Brown was not involved in the FMC deal, but was able to figure out that FMC was involved through casual discussions with other Goldman employees about a major Chicago-based company planning to reorganize, and by secretly visiting the "cubicle" office of a Goldman employee working on the deal who had left FMC's annual report on her desk. Brown knew none of the details but deduced that FMC was the Chicago company contemplating a reorganization. He tipped off Boesky about FMC's plans approximately three weeks prior to FMC's public announcement on Friday, February 21, 1986.

Between February 18 and February 21, 1986, Boesky and his affiliated entities purchased about 95,300 shares of FMC stock, or roughly thirteen percent of all FMC shares traded on those days. During the same four-day period, the price of FMC's stock rose from $71.75 to about $82, at which point, during the morning of February 21, FMC requested the New York Stock Exchange to temporarily suspend trading so the company could announce that it was considering a reorganization. When trading resumed following the announcement, Boesky proceeded to sell off substantially all of his holdings, at a profit of about $975,000. The stock price continued to rise through the afternoon before reaching $85.625 when the market closed.

The $85.625 figure approximated the $85 value Goldman assessed as a fair per share valuation of FMC's outstanding stock for purposes of the reorganization. Also according to Goldman's estimate, the market would value each share of new FMC stock (the "stub equity") at $15 per share. FMC's 150 management shareholders would therefore exchange each of their outstanding shares for 5.667 shares of the stub equity, for a total value of $85. Public shareholders would exchange each of their shares for one share of the stub equity plus $70 cash, also for a total of $85. FMC's Thrift Plan would receive for each old share four shares of stub equity and $25 cash. Based on its conclusion that each shareholder group would receive equal value in the transaction, Goldman issued its formal "fairness" opinion. FMC's board of directors approved the plan on Saturday, February 22, 1986, and the company announced the terms the following day.

On February 24, 1986, Lance Lessman, one of Boesky's key financial advisors, recommended FMC to Boesky as an attractive investment to realize a substantial short-term profit. Internal Boesky organization memoranda reveal that Lessman thought Goldman had undervalued the stock at $85 per share, and that $100 per share was a more realistic buyout value for the stock. He viewed the proposed transaction as "blatantly discriminatory," and felt there were "definitely ways to pump out more value to shareholders." Lessman advised Boesky that the transaction probably would not be consummated as planned in light of a rising stock market and a suit by FMC's shareholders challenging the transaction.

FMC charges that Lessman's recommendation was not based on his own research, but rather on confidential information he received from Frank Brosens, a member of Goldman's arbitrage division. Brosens spoke to Lessman on instructions from a Goldman official working on the FMC restructuring who asked Brosens to try to stimulate interest in the deal among members of the arbitrage community. Brosens apparently spoke to Lessman on March 12 and March 14, 1986, after the terms of the deal were made public, and told Lessman that FMC was a good value at $85 per share. As Judge Pollack found, there is no evidence in the record that Brosens disclosed FMC's financial projections or other confidential information to Lessman. *See FMC Corp. v. Boesky (In re*

*Ivan F. Boesky Sec. Litig.),* 825 F.Supp. 623, 628 (S.D.N.Y.1993) [hereinafter "FMC"].

In the two weeks following FMC's February 21 public announcement, FMC stock traded slightly above the $85 per share estimate. On March 3, 1986, nine days before FMC alleges Brosens first disclosed inside information to Lessman, Boesky began buying FMC stock in a month-long spree that lasted until April 4, 1986. This time Boesky purchased nearly two million shares, which accounted for roughly fifty percent of the trading volume in FMC stock during this period. FMC's stock price climbed from $87.25 on March 12, 1986 to $93.75 on April 4, 1986. FMC publicly disclosed its confidential financial projections on April 2, 1986, when it filed its Form S–2 registration in connection with the restructuring.

Because of the increase in the price of FMC stock during this period, Goldman advised FMC that it would have to withdraw its fairness opinion if the terms of the plan were not revised to compensate the public shareholders adequately. To resolve the fairness problem, Goldman suggested increasing the cash distribution to public shareholders from $70 to $80 per share. FMC agreed to increase the cash portion of the package, and the deal therefore cost FMC about $220 million more than it would have under the original proposal. Goldman also revised its estimate of the value the market would place on the stub equity from $15 to approximately $17 per share, bringing the total per share price of the transaction to $97 ($80 cash + $17 stub equity). Under this revised plan, this new price would be realized by keeping the same 5.6667 to 1 ratio for the management shareholders and by issuing to FMC's Thrift Plan 4.209 shares of stub equity instead of four for each share of old stock. FMC approved the revised plan on April 26, 1986, and publicly announced the terms later that day. FMC's shareholders voted favorably on the plan on May 22, 1986, and it was successfully implemented on May 28, 1986.

## II. *Procedural Background*

FMC filed its complaint on December 18, 1986 in the United States District Court for the Northern District of Illinois (Ann C. Williams, *Judge*). The complaint contained claims under the securities laws, the Racketeer Influenced and Corrupt Organizations Act, and state common law. FMC sought to recover the fees paid to Goldman and consequential damages, as well as Boesky's profits and the lost value of its confidential information. After carefully studying the complaint, Judge Williams concluded that FMC lacked standing because it failed to state an injury sufficient to make out a "case or controversy" cognizable under Article III of the United States Constitution. She therefore dismissed FMC's claims under the federal securities laws and RICO, and declined to exercise pendent jurisdiction over FMC's state law claims. *FMC Corp. v. Boesky,* 673 F.Supp. 242 (N.D.Ill.1987).

In a 2–1 decision with three separate opinions, the Seventh Circuit, addressing the "narrow" issue of "whether FMC has constitutional standing to assert its claims in federal court," disagreed with the district court and reinstated the complaint. *FMC Corp. v. Boesky,* 852 F.2d 981, 987 (7th Cir.1988). The Seventh Circuit's decision, which is the law of the case, held that if the complaint were taken as true, FMC had alleged an Article III injury to its property interest in exclusive use of its confidential business information. *Id.* at 989–90. The court did not address whether such an injury was sufficient to satisfy prudential standing limitations or to support a claim for damages under the federal statutory or state common law theories asserted in FMC's complaint. *See id.* at 994; *id.* at 996 (Ripple, J., concurring).

On remand, Judge Williams again dismissed FMC's securities law claims under Rule 12(b)(6), this time because FMC did not allege damages compensable under the securities laws and because she found that the reorganization did not involve a "purchase" or "sale" of securities under Rule 10b–5. *FMC Corp. v. Boesky,* 727 F.Supp. 1182, 1191, 1194, 1197 (N.D.Ill.1989) [hereinafter *"Boesky"*]. She also dismissed FMC's RICO claims against Goldman because she found FMC's aiding and abetting theory inapplicable in the RICO context, but allowed FMC the opportunity to replead if it could allege

damages and primary RICO liability on Goldman's part consistent with her opinion. *Id.* at 1199–1201. Judge Williams declined to dismiss the state law claims because she found that, at a minimum, FMC adequately stated an injury at least equal to the cost of producing the confidential information Boesky misappropriated. *Id.* at 1192.

On April 5, 1990, the Judicial Panel on Multi–District Litigation transferred FMC's action to the Southern District of New York for consolidation with other Boesky-related cases pending before District Judge Milton Pollack. After nearly two years during which FMC conducted substantial discovery, Goldman filed a motion before Judge Pollack for summary judgment on FMC's remaining claims. The main thrust of Goldman's motion was that FMC had suffered no compensable injury as a result of Goldman's alleged violations. In addition to the parties' affidavits, Judge Pollack heard testimony from witnesses on both sides during the course of a three-day hearing. *See* Fed.R.Civ.P. 43(e). At the conclusion of this hearing, on April 8, 1993, Judge Pollack granted judgment against FMC on its RICO claims for failure to replead in a timely manner. *See* Fed. R.Civ.P. 41(b). On July 1, 1993, Judge Pollack granted summary judgment against FMC on its remaining claims. *FMC,* 825 F.Supp. at 637–38.

In a characteristically thorough opinion, Judge Pollack found that Goldman's premature disclosure of FMC's reorganization plans did not cause FMC any injury cognizable under the securities laws. *Id.* at 635–36. He also held that FMC was not entitled to rescission and restitution of Goldman's fee since FMC realized the full benefit of Goldman's services through the completed reorganization, and adduced no proof that Goldman intentionally breached its fiduciary duties. *Id.* at 636–37. FMC now appeals Judge Williams's order dismissing its securities claims on the pleadings, and Judge Pollack's grant of summary judgment on the remaining claims. For the reasons that follow, we affirm.

## DISCUSSION

At its heart, this appeal is about injury. FMC claims it spent $220 million more on its restructuring than it should have, and seeks to shift that cost to Goldman because of the illegal conduct of Goldman's employees, Brown and Brosens. FMC alleges that it is entitled to four types of relief: first, consequential damages based on the entire $220 million differential between the original restructuring plan and the consummated plan caused by Goldman's violations; second, compensatory damages for the lost value of its confidential information that was misappropriated and prematurely disclosed; third, disgorgement of Boesky's profits on the grounds that Goldman aided and abetted his violations of Rule 10b–5; and fourth, restitution of Goldman's $17.5 million fee because of Goldman's breach of its contractual and fiduciary duties.

■ We agree with the combined decisions of district judges Williams and Pollack that FMC has either not alleged or is unable to prove a compensable injury. We review both decisions *de novo. See Kay–R Elec. Corp. v. Stone & Webster Constr. Co.,* 23 F.3d 55, 56 (2d Cir.1994) (summary judgment); *Sykes v. James,* 13 F.3d 515, 518–19 (2d Cir.1993) (motion to dismiss), *cert. denied,* — U.S. ——, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994). We agree that under the undisputed facts of this case, the $220 million differential, the cost of creating the confidential financial projections and Goldman's fee cannot be recovered by FMC. In addition, because FMC has failed to state a claim against Goldman under Rule 10b–5, it cannot recover Boesky's profits.

### I. *The $220 Million Differential*

■ FMC seeks to recover the $220 million difference in the amounts it paid out to shareholders under the plan originally proposed and the one eventually accomplished. It claims that Judge Pollack erred in granting summary judgment because "[t]he jury could ... reasonably conclude that Boesky's trading was a substantial factor in the rise of the price of FMC stock, and that the rise in the price of the stock forced FMC to abandon its original recapitalization plan." In seeking to recover the additional amounts paid to its shareholders, FMC overlooks one

important circumstance: because the excess amounts inured to the benefit of FMC's shareholders, FMC cannot claim that it was injured thereby.

FMC's restructuring involved, on the one hand, a *pro rata* distribution of corporate assets to the public shareholders in return for their surrender of a portion of the publicly held equity. The management shareholders, in contrast, would maintain their current equity holdings with "the result being, of course, that management would end up with a larger proportionate share of the reduced total equity investment in FMC." *FMC*, 825 F.Supp. at 633. Aside from the purpose of discouraging takeover bidders by simultaneously increasing the percentage of shares held by management and FMC's debt-to-equity ratio, the economic effect of the transaction essentially was a wash—a zero sum transaction in which there were no special preferences afforded or profits to be made. By design every shareholder was supposed to receive identical consideration for each share given up in an amount equal to the value of each share.

To illustrate this point, it is useful to contrast FMC's "going private" transaction with the public tender offer presented in *Litton Industries, Inc. v. Lehman Brothers Kuhn Loeb Inc.*, 967 F.2d 742 (2d Cir.1992). In *Litton*, plaintiff Litton Industries, Inc. made a tender offer for the stock of an external target company. Like FMC, Litton alleged that employees of its investment banker drove the target's stock price up by trading on material nonpublic information, and that the price it paid to acquire the target "was artificially inflated as a result of insider trading in [the target's] common stock." *Id.* at 744. Although the tender offer ultimately was successful, Litton sought to recover the "overpayment" from the investment banker. We held that under certain circumstances an acquiring corporation may maintain a Rule 10b–5 cause of action against its investment banker where it could prove the investment banker's premature trading caused an increase in the stock price and forced the acquirer to pay more for the target company than it otherwise would have. *See id.* at 749.

While the key issue in *Litton* was whether the insider trading caused the increase in the deal price, the basis for the holding is instructive. The underlying assumption in *Litton* was that the plaintiff, as the purchaser of an external target company, had a duty to maximize its own shareholders' value by minimizing the cost of the transaction. To this end, Litton disclosed confidential business information so its investment banker could estimate "the minimum premium required to induce a sufficient percentage of the target's shareholders to tender their shares." *Id.* at 749.

A necessary element of the *Litton* decision, though one not discussed explicitly, is that Litton had no duty to disclose its internal analyses to the target company's shareholders. It is in the absence of such a duty that the acquirer can seek to pay the "minimum premium" as opposed to making its highest offer, or even an offer reflecting what the acquirer believes to be the fair value of the target. If Litton's investment banker did not disclose the information, it could have remained secret indefinitely, and Litton would have been the ultimate beneficiary of any value that information had in the transaction. Disclosure in the absence of a duty to disclose caused the benefit of the information to pass instead to the investment banker and ultimately to the target's shareholders as opposed to the acquirer's shareholders who were its rightful owners.

In contrast with Litton, FMC's duty was to provide FMC public shareholders with consideration equal in value to that received by the management shareholders, and to disclose fully all information relevant to the public shareholders' evaluation of the deal. As Judge Pollack put it, FMC had no legitimate interest "in short-changing the public shareholders in the restructure and achieving a windfall profit for themselves, by maintaining in confidence business information pertinent to the fair value of the stock...." *FMC*, 825 F.Supp. at 633; *see Chiarella v. United States*, 445 U.S. 222, 227–35, 100 S.Ct. 1108, 1114–18, 63 L.Ed.2d 348 (1980) (holding that duty to disclose under Rule 10b–5 arises from fiduciary relationship); *Stroud v. Grace*, 606 A.2d 75, 84 (Del.1992)

(holding that board of directors has duty of full disclosure when it seeks shareholder action); Bruce A. Hiler, *The SEC and the Courts' Approach to Disclosure of Earnings Projections, Asset Appraisals, and Other Soft Information: Old Problems, Changing Views*, 46 Md.L.Rev. 1114, 1169 (1987) (noting "common-law notion that it is fraudulent for a fiduciary to have an informational advantage over the beneficiary with whom the fiduciary trades") (citing *Chiarella*).

FMC's claim that Boesky's insider trading *caused* the deal to be revised therefore misses the point. Because FMC's duties included making complete disclosure and fully compensating its shareholders, beyond showing that the transaction became more expensive, FMC must at least show that it paid more for the stock than it was worth. FMC could not seek the "minimum premium," but rather was obligated to offer a "fair" price. Because the shareholders were the equitable owners of the information, no claim of injury can lie where premature disclosure of that information benefitted them in their dealings with the FMC. *See FMC*, 825 F.Supp. at 633.

Judge Pollack determined, and we agree, that FMC presented no evidence that the stock was not worth the $97 per share price ultimately paid, or that the $85 per share originally contemplated was adequate to compensate the public shareholders. *See id.* at 634. Unlike Litton, FMC cannot claim that Boesky stole a premium the company was entitled to, since FMC had no legitimate interest in realizing a gain at its public shareholders' expense. Therefore, even if Boesky's trades caused the stock price to rise prematurely, because the transaction was approved by both the shareholders and the board of directors, FMC cannot claim injury unless it shows, at a minimum, that the price increase also was artificial. *Cf. City Capital Assocs. Ltd. Partnership v. Interco, Inc.*, 551 A.2d 787, 801 (Del.Ch.) (expressing doubt as to whether *pro rata* distribution of cash to shareholders could ever constitute an unreasonable response by the board of directors to a bid perceived to be inadequate), *appeal dismissed as moot*, 556 A.2d 1070 (Del.1988).

That the $97 per share figure was warranted based on all available information is evident from the fact that FMC's board of directors voted to increase the cash payout and to continue to recommend the deal to the shareholders. *See Viacom Int'l Inc. v. Icahn*, 946 F.2d 998, 1001 (2d Cir.1991) (finding directors' valuation to be relevant in establishing "fair price" higher than market price), *cert. denied,* —— U.S. ——, 112 S.Ct. 1244, 117 L.Ed.2d 477 (1992). In addition, on April 25, 1986, three weeks after FMC fully disclosed the projections and well after Boesky divested his interest in the company, FMC stock was still trading around $97 per share. Furthermore, the "stub" share which was valued by FMC at about $17 per share, actually opened at $19.25 per share, indicating that the stock probably was still slightly undervalued in the transaction despite the increased cash payout. *See FMC*, 825 F.Supp. at 634. In the face of this proof that the $97 per share figure was fair, FMC produced no evidence to the contrary. The absence of evidence that the $220 million increased payout constituted something other than FMC giving its public shareholders full consideration for their stock is fatal to FMC's recovery of these amounts. Judge Pollack therefore properly granted summary judgment to Goldman on this theory.

■ In a related claim, FMC asserts that regardless of whether it can recover the $220 million, Goldman should be liable for the increased interest and other costs of the additional debt required to fund the revised plan. However, if the $220 million is not a consequential injury flowing from Goldman's conduct but rather a necessary additional payment to achieve fairness, it follows *a fortiori* that the cost of funding that additional expenditure cannot be recovered.

Because FMC is unable to prove any damages, it will not be able to recover on its RICO claims under 18 U.S.C. §§ 1962(c)–(d). We therefore do not reach the question decided in the negative by Judge Williams of whether the doctrine of *respondeat superior* applies in civil RICO actions, *see Boesky*, 727 F.Supp. at 1199.

## II. *Misappropriation of Confidential Information*

■ FMC next contends that it is entitled to recover the cost of creating the confidential information disclosed to Boesky prematurely. Our conclusion in Part I, *supra*, that FMC had no legitimate interest in keeping its financial projections confidential to the public shareholders' detriment, and that there is no evidence that the transaction as consummated was unfair, also precludes a finding that FMC was injured by Goldman's alleged premature disclosure of that information to Boesky. As Judge Pollack noted, "[t]his is not a case where valuable corporate secrets were destroyed by misappropriation or unauthorized disclosure, which otherwise could and would have been kept confidential indefinitely, and of which any potential unrealized value was thus destroyed." *FMC*, 825 F.Supp. at 636; *see Chiarella*, 445 U.S. at 227–35, 100 S.Ct. at 1114–18. FMC's obligation in the restructuring was to exploit the information for the benefit of the public shareholders; therefore, the company's claim that it lost exclusive use of the information is misplaced.

As was true with respect to FMC's claim for the additional $220 million payment, FMC's misappropriation claim assumes that there was some legitimate corporate purpose for the information beyond providing the public shareholders their due. In the context of this case, the information had no secrecy value to FMC that was not ultimately realized by the company. The premature disclosure to Boesky injured the public shareholders because the tip enabled Boesky to trade with them while in possession of undisclosed information. However, the only parties injured "would be those who bought or sold securities with Boesky directly, or even indirectly through the market, not FMC, whose recapitalization was neither executed on the market nor approved by FMC's shareholders until May 22, 1986, well after the non-public information had been publicly disclosed by FMC itself...." *FMC*, 825 F.Supp. at 634 (footnote omitted).

The harm from the premature disclosure in this case was that Boesky, as opposed to the public shareholders, got to cash in on any value of the information, not that FMC was unable to close its recapitalization at what evidently was an inadequate price. Absent some legitimate purpose for keeping the information secret or some tangible harm from the early disclosure, FMC suffered no legally cognizable injury.

## III. *Boesky's Profits*

■ FMC also claims that it should be able to recover Boesky's illegal profits from Goldman as an aider and abettor of Boesky's insider trading. FMC argues that Goldman's aider and abettor liability results from the passing of confidential information from Brosens in Goldman's arbitrage department to Boesky's underling Lessman and that Goldman is therefore jointly and severally liable in the amount of these profits. FMC's sole asserted basis for recovery of Boesky's profits is its claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b–5. However, FMC has failed to state a claim against Goldman under these provisions.

FMC's claim is precluded by the Supreme Court's recent ruling that held that there is no private civil remedy against those who aid and abet a violation of Rule 10b–5. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* ─── U.S. ───, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). In *Central Bank*, the holders of defaulted bonds, in addition to their claims against the issuer and others alleging primary liability under Rule 10b–5, sued the indenture trustee on the theory that the trustee aided and abetted the other defendants' violations by recklessly ignoring its oversight duties. In holding that the claim against the trustee could not stand, the Supreme Court found that § 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act. The proscription does not include giving aid to a person who commits a manipulative or deceptive act." *Id.* at ───, 114 S.Ct. at 1448 (citations omitted). Since FMC's claim for Boesky's profits is premised on the theory that Goldman aided and abetted Boesky's Rule 10b–5 violations, recovery

is precluded by *Central Bank* as a matter of law.

Not surprisingly, in the wake of *Central Bank,* FMC asks us to construe its complaint as alleging that Goldman has primary liability for violations of Rule 10b–5. However, paragraph 96 of the second amended complaint reads, "Defendants Boesky and the Boesky Entities, with the assistance of Brown, Brosens, Sokolow, and Levine, directly or indirectly, singly, by aiding or abetting, ... employed devices schemes and artifices to defraud ..." in violation of § 10(b) and Rule 10b–5. FMC's theory of the case in the complaint is that Boesky and the Boesky entities committed the substantive offense, and Goldman, as a controlling person of Brown and Brosens, aided and abetted that offense. Indeed that is the position FMC has consistently maintained from the filing of the second amended complaint through its brief on appeal ("FMC should be able to recover from Goldman, which through Brosens aided and abetted Boesky...."). Nowhere in FMC's complaint does it allege any "manipulative" or "deceptive" act by Goldman or any of its employees, a prerequisite to primary liability under § 10(b). *See Central Bank,* —— U.S. at ——, 114 S.Ct. at 1446. No claim has been made that Goldman has primary liability under Rule 10b–5 and it is too late now to assert one.

We thus do not decide whether Judge Williams correctly ruled that FMC could not recover under either Rule 10b–5 or § 9(a) of the Exchange Act, 15 U.S.C. § 78i(a), because it was not a purchaser or seller of securities as required by *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). *Boesky,* 727 F.Supp. at 1193–96. *Central Bank* provides an alternative basis for affirming her dismissal of the 10b–5 claim, and FMC does not appeal Judge Williams' dismissal of the § 9(a) claim on the alternative grounds that FMC failed to allege damages compensable under that section, *see id.* at 1196–97.

█ FMC claims that it may recover as a surrogate for those shareholders who did trade contemporaneously with Boesky, and therefore seeks disgorgement of Boesky's profits on that theory. *Cf. Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 172–73 (2d Cir.1980) (discussing the disgorgement measurement of damages). According to FMC, "[b]ecause the fiduciary duty is owed to the corporation, the insider's profits are properly disgorged to the corporation, and the corporation is a proper plaintiff in an action against the insider." However, in this case, FMC shareholders who traded with Boesky have initiated a class action suit on their own behalf to recover Boesky's profits. Thus, even assuming that FMC's surrogate plaintiff theory could survive the purchaser/seller limitation of *Blue Chip Stamps* and is otherwise viable, there is no need for FMC to act as a surrogate in this case. *See Freeman v. Decio,* 584 F.2d 186, 195 (7th Cir.1978) ("When the [investors who were the true victims of the insider trading] in fact bring an action seeking damages from the insiders, ... the need for a surrogate plaintiff disappears....").

In sum, FMC has no right under Rule 10b–5—either on its own behalf or as surrogate for its shareholders—to recover the fruits of Boesky's illegal trades. Judge Williams properly dismissed FMC's claim.

## IV. *Restitution of Goldman's Fee*

Finally, FMC claims that it is entitled to restitution of Goldman's fee because Goldman breached its fiduciary duties to FMC. Judge Pollack ruled that FMC could not recover under this theory as a matter of law. We agree.

In deciding this claim, Judge Pollack did not indicate which state's law governed. The only two candidates are Illinois and New York. FMC's principal place of business is in Illinois, while Goldman has its principal place of business in New York and maintains an office in Illinois; it also appears from the record that the contract from which Goldman's fiduciary duty to FMC arose was formed in either Illinois or New York. We do not remand for resolution of the choice-of-law issue, however, because FMC has no claim against Goldman under the law of either state.

█ A principal is entitled to restitution of compensation paid if an agent breaches its

duties of loyalty or obedience. *Restatement (Second) of Agency* § 469 cmt. a (1958) [hereinafter *Restatement* ]; *see Vendo Co. v. Stoner*, 58 Ill.2d 289, 314, 321 N.E.2d 1, 14 (1974), *cert. denied*, 420 U.S. 975, 95 S.Ct. 1398, 43 L.Ed.2d 655 (1975); *Monotronics Corp. v. Baylor*, 107 Ill.App.3d 14, 18, 62 Ill.Dec. 760, 764, 436 N.E.2d 1062, 1066 (App. Ct.1982); *Soam Corp. v. Trane Co*, 608 N.Y.S.2d 177, 178 (App.Div.1994). If an employee of the agent commits the act constituting a breach of the agent's fiduciary duty to the principal, under the doctrine of *respondeat superior* the agent is liable to the principal only if the agent's employee was acting within the scope of his employment. *Cf. Randi F. v. High Ridge YMCA*, 170 Ill.App.3d 962, 964, 120 Ill.Dec. 784, 786, 524 N.E.2d 966, 968 (App.Ct.1988) (discussing *respondeat superior* standard generally); *Sims v. Bergamo*, 3 N.Y.2d 531, 534–36, 169 N.Y.S.2d 449, 451–53, 147 N.E.2d 1, 3–4 (1957) (same). For FMC's claim to survive summary judgment, then, there must be a genuine issue of material fact as to whether a Goldman employee (1) acted in the scope of his employment and (2) committed an act constituting a breach of Goldman's duty of loyalty to FMC.

■ FMC predicates its claim of breach of fiduciary duty on the allegations that two Goldman employees, Brown and Brosens, communicated its confidential information to Boesky and his cronies. Turning first to Brown, we conclude that Goldman is not liable for Brown's acts because Brown did not act in the scope of his employment. While an employer may be liable for even intentional and criminal acts committed by its employee, those acts must in some way further the interests of the employer, and not solely benefit the employee. *Randi H.*, 170 Ill.App.3d at 964–65, 120 Ill.Dec. at 788, 524 N.E.2d at 968; *Sims*, 3 N.Y.2d at 533–36, 169 N.Y.S.2d at 450–51, 147 N.E.2d at 2–4 (requiring evidence to show that employee's tortious act was in furtherance of his employer's interests); *Restatement* § 235. The record reveals that Brown divined FMC's identity through surreptitious activities unknown to others at Goldman. As is evident even from FMC's complaint, Brown sold nonpublic information to line his own pockets in violation of every fiduciary duty he owed to Goldman as its employee. None of his actions furthered Goldman's interests. Whether Goldman was negligent in maintaining lax internal controls which Brown easily sidestepped is irrelevant in a claim for restitution. Since Brown did not act within the scope of his employment, as FMC conceded below, *see FMC*, 825 F.Supp. at 626, Goldman cannot be held liable under a theory of *respondeat superior* for breach of the duty of loyalty on the basis of Brown's acts.

■ Goldman also cannot be held liable for Brosens's acts, but for different reasons. Brosens clearly acted within the scope of his employment. Indeed, Brosens engaged in discussions with Lessman on express direction from his superiors at Goldman. After construing the evidence in the light most favorable to FMC, however, there is no genuine issue of material fact as to whether these discussions constituted a breach of the duty of loyalty. An agent breaches its duty of loyalty if it does not "act solely for the benefit of the [principal] in all matters connected with [the] agency." *Mullaney, Wells & Co. v. Savage*, 78 Ill.2d 534, 546, 37 Ill.Dec. 572, 578, 402 N.E.2d 574, 580 (1980); *Restatement* § 387; *see Landau v. Percacciolo*, 50 N.Y.2d 430, 436–37, 429 N.Y.S.2d 566, 568–69, 407 N.E.2d 412, 415–16 (1980). No inference of breach can reasonably be drawn from the record. First, despite extensive discovery by FMC, there is no proof that Brosens in fact disclosed confidential business information to Boesky. Second, even if such disclosures were made, his conversations were intended to further FMC's interests in the reorganization. Not a shred of evidence shows that Goldman, through Brosens's efforts, sought to advance any interests of its own separate and apart from the success of FMC's recapitalization.

FMC's allegation that Goldman "consistently placed its interests in maintaining its relationship with the Boesky organization" above FMC's interest in the confidentiality of its information is not enough to save this claim from summary judgment. When a motion for summary judgment is made, "an adverse party may not rest upon the mere allegations or denials of the adverse party's

pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The specific facts marshaled in rebuttal must be such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). FMC proffers as evidence of Goldman's faithless cozying up to Boesky the facts that Brosens and Lessman regularly exchanged information for years, that their bosses had regular contact over the years, and that Goldman did not disclose the Brosens–Lessman conversations to either FMC or the SEC. No reasonable jury could find a breach of the duty of loyalty based on such evidence. "[T]o defeat a motion for summary judgment a plaintiff cannot rely on conjecture or surmise and must do more than simply show that there is some metaphysical doubt as to the material facts." *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir.1994) (citations and quotations omitted).

## CONCLUSION

FMC cannot recover Boesky's profits from Goldman because FMC failed to state a claim against Goldman under § 10(b) and Rule 10b–5. FMC is not entitled to recover the $220 million differential paid to its public shareholders necessary to fund the revised deal, the cost of the misappropriated information, or Goldman's fee. Accordingly, the judgments below are affirmed.